**SUN OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**Florida Gas Transmission Company, Intervenor.**

**No. 23629.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1970.

Decided Feb. 12, 1971.

As Amended Feb. 19 and Feb. 25, 1971.

J. Skelly Wright, Circuit Judge, dissented and filed opinion.

---

Mr. Stanley M. Morley, Washington, D. C., with whom Messrs. Louis Flax and Francis H. Caskin, Washington, D. C., were on the brief, for petitioner. Mr. Kirk W. Weinert, Washington, D. C., also entered an appearance for petitioner.

Mr. James N. Horwood, Atty., Federal Power Commission, of the bar of the Supreme Court of Ohio, pro hac vice, by special leave of Court, for respondent. Messrs. Gordon Gooch, General Counsel, Federal Power Commission, Peter H. Schiff, Solicitor, Abraham R. Spalter, Asst. General Counsel, and David F. Stover, Atty., Federal Power Commission, were on the brief, for respondent.

Mr. Leon M. Payne, Houston, Tex., with whom Messrs. R. Y. Patterson, Jr., and Norman E. Duke, Winter Park, Fla., Thomas F. Brosnan and George J. Meiburger, Washington, D. C., were on the brief, for intervenor.

Before WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT and TAMM, Circuit Judges.

TAMM, Circuit Judge:

The primary issue involved in this case is whether a rate of return allowed Florida Gas Transmission Company (hereinafter "Florida Gas") by the Federal Power Commission (hereinafter "the Commission") is invalid because the Commission did not make adequate findings to support its decision. After consideration of this issue and all others presented, we hold that the findings given in support of the rate determination are inadequate and remand the case to the Commission for further proceedings.

## I. History of the Case

Florida Gas is a natural gas pipeline company subject to the Commission's jurisdiction under the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (1964). As part of its operations, Florida Gas transports gas produced in Texas and Louisiana by Sun Oil Company (hereinafter "Sun Oil" or "Sun") to Florida Power Corporation (hereinafter "Florida Power") and Florida Power and Light Company (hereinafter "Florida P&L"). The rates charged for this transportation are set forth in FPC Rate Schedules T-1 (for Florida Power) and T-2 (for Florida P&L). Sun Oil has entered into contracts with Florida Power and Florida P&L whereby the price it receives for gas sold to these companies is tied to

Florida Gas' transportation rates. These contracts require Sun Oil to absorb half the amount by which the T-1 rate exceeds 14 cents per MM Btu[1] transported and the entire amount by which the T-2 rate exceeds 17.5 cents per MM Btu.

On August 14, 1965, in what was later designated FPC Docket No. RP66-4, Florida Gas filed to increase its T-1 rate from 14.6 cents to 17.9 cents per MM Btu and its T-2 rate from 18.5 cents to 21.9 cents per MM Btu. Pursuant to section 4 of the Natural Gas Act, 15 U.S.C. § 717c (1964), these new rates became effective, subject to refund, on November 1, 1965.

Early in 1967 hearings were held before one of the Commission's Hearing Examiners to determine whether Sun Oil was entitled to a refund under the new rates. In the meantime Florida Gas received authorization from the Commission for a major expansion of its pipeline capacity. Florida Gas Transmission Co., 37 F.P.C. 424 (1967). In this separate proceeding Florida Gas had offered to make certain rate reductions and the Commission in its opinion conditioned the company's expansion upon its adoption of these lower rates. (*Id.* at 445.) The Commission also stated that a rate investigation pursuant to section 5(a) of the Natural Gas Act, 15 U.S.C. § 717d (1964), would be held to determine whether the new rates were reasonable in light of Florida Gas' expanded operation. (*Id.*) On March 31, 1967, in what later became Docket RP68-1, Florida Gas made the rate reduction filing required by the Commission. Shortly thereafter Sun Oil moved for consolidation of this docket with the RP66-4 rate proceedings. The Commission granted this motion and later al-

lowed yet another rate proceeding, Docket RP69-2, to be consolidated with the earlier two dockets.

The reduced T-1 and T-2 rates involved in Docket RP68-1 went into effect on June 10, 1968. Docket RP66-4, the only proceeding at issue here, therefore relates only to the "locked in" period from November 1, 1965 to June 9, 1968. Because of the substantial delay which ensued as a result of consolidating the three dockets, the parties decided that the RP66-4 portion of the case should be tried not on a test year basis, as originally agreed, but on the basis of actual costs incurred during the entire "locked in" period. Accordingly, Florida Gas was permitted to update its cost of service evidence to cover this period.

The consolidated cases were then "phased," that is, the Commission first determined the rates of return, leaving the other issues involving cost of service and rate design to be resolved at a later date. In the proceedings before the Commission's Hearing Examiner in the first "phase," the primary issue presented as to Docket RP66-4 was whether Florida Gas was estopped from claiming a rate of return greater than 6.5 per cent. The rates it requested in its original filing in 1965 were designed to generate this return, and the Commission's Staff felt the company was bound by this figure. (J.A. 368.) Since the rates in effect during the "locked in" period of this docket had in fact generated a return of 6.98 per cent, the Staff felt Sun Oil was entitled to a refund.[2]

The Examiner rejected this argument, holding that Florida Gas was not bound by the rate of return utilized in its original filing. (J.A. 374.) He could not determine from the record before him what would be a fair and reasonable

---

1. The scale of measurement on which the rates are based is a million British thermal units, which is approximately equal to one thousand cubic feet of gas.

2. The difference between the amount Florida Gas earned at the 6.98 per cent rate of return and the amount it would have earned if the rate of return had in fact been 6.5 per cent was $1,350,000. (J.A. 400.) Sun Oil absorbed approximately $1,000,000 of these revenues and thus would have been entitled to a refund of this amount if the Commission had set Florida Gas' rate of return at 6.5 per cent in Docket RP66-4. (*Id.*)

rate of return (J.A. 367), apparently because "no one cross-examined the principal rate of return evidence put in the record by Florida Gas [or] * * * put in an answering case or evidence of any kind on the subject." (J.A. 368.) The Examiner did feel, however, that Florida Gas had established a prima facie case for the 6.98 per cent actually earned. (J.A. 374.) To provide "fairness to all sides" (J.A. 368), the Examiner allowed Sun Oil and the Commission's Staff thirty days after the issuance of his opinion in which to present new evidence. (J.A. 374.)

Neither Sun Oil nor the Commission's Staff took advantage of this opportunity to contest the merits of the 6.98 figure before the Examiner. Instead, they appealed his decisions in all three dockets to the Commission, which handed down its rate determinations for the three dockets in FPC Opinion No. 561. (J.A. 396.) With regard to Docket RP66–4, the Commission agreed with the Examiner that Florida Gas was not limited by its filing to a 6.5 per cent rate of return. (J.A. 401.) It held that a fair and reasonable rate of return for the "locked in" period involved in this docket would be 7 per cent, which allowed Florida Gas a return on equity of 9.36 per cent. (J.A. 404.) For the later two dockets the Commission allowed a rate of return of 7.25 per cent, which would result in a return on equity of 9.9 per cent. (J.A. 418.) Sun applied for a rehearing, contesting only the rate of return allowed in Docket RP66–4. It alleged that this rate was not supported by substantial evidence or adequate findings and that the Examiner, by in effect requesting Sun Oil to come forward with additional evidence, unlawfully shifted the burden of proof from Florida Gas to Sun Oil. The Commission denied Sun's application and this appeal followed.

## II.   The Adequacy of the Commission's Findings

### A.   The Tests to be Applied.

In the leading case of Bluefield Waterworks and Improvement Co. v. Public Service Comm., 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), the Supreme Court set forth guidelines as to what constitutes a proper return on equity, return on equity being the critical factor involved in determining rate of return.[3] There the court said:

A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks, and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

(*Id.* at 692–693, 43 S.Ct. at 679. *See also* FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Judgments made under these guidelines are obviously qualitative, and, since the Commission is acknowledged to have expertise in this complex field, its decisions are entitled to great weight. It is, however, required under the Administrative Procedure Act, 5 U.S.C. § 1001 *et seq.* (1964), to include in each of its decisions "a statement of * * * findings and conclusions, as well as the reasons or basis therefor, upon all the

---

3.  Cost of debt is the other primary factor involved in rate of return determinations. Here both parties agree that the cost of debt for the period covered by Docket RP66–4 was 5.66 per cent.

material issues of fact, law or discretion presented on the record * * * " 5 U.S.C. § 1007(b) (1964). These findings and conclusions must be sufficient to demonstrate that the Commission has considered "all relevant facts" (Bluefield Waterworks and Improvement Co. v. Public Service Comm., *supra*, 262 U.S. at 692–693, 43 S.Ct. 675) and that it has "exercised its practical, expert judgment." [4] State Corp. Comm. of Kansas v. FPC, 206 F.2d 690, 722 (8th Cir. 1953) cert. denied sub nom. Northern Natural Gas Co. v. FPC, 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954).

### B. The Docket RP66–4 Portion of Opinion 561.

Opinion 561 is divided into several portions. The first of these is devoted to Docket RP66–4, but findings and conclusions made elsewhere in the opinion are arguably relevant to the rate determination made in this docket. To simplify analysis of the case we will first consider the findings and conclusions set forth in the RP66–4 portion and will then examine those given in the remainder of the opinion.

In the Docket RP66–4 portion of its opinion the Commission first summarized briefly the testimony of Dr. Dorau, Florida Gas' witness, who had "presented evidence of comparable earnings, cost of debt capital and the return needed

for capital attraction" and had concluded that a rate of return of 6.88 per cent would not be excessive.[5] (J.A. 402.) The Commission then gave the equity and debt ratios and the cost of embedded debt for Florida Gas for the period in question and stated that it had reviewed the other economic evidence in the record. (J.A. 403.) Finally, the Commission reviewed the rates of return and returns on equity actually earned by other natural gas companies and by companies in the Bell System and indicated that it used these comparative earnings as a basis in determining that Florida Gas' rate of return should be seven per cent. (J.A. 404.)

■ We feel these findings and conclusions are clearly insufficient to support the Commission's rate determination. Our primary authority for this statement is State Corp. Comm. v. FPC, *supra*, in which a Commission opinion very similar to this portion of Opinion 561 was found to be defective. There the Commission also made a general reference to the evidence in the record and gave the cost of embedded debt and the equity and debt ratios of the company whose rates were in question, Northern Natural Gas Company (hereinafter "Northern"). (*Id.*, 206 F.2d at 718.) In determining the rate of return to be allowed Northern, the Commission seemed to rely primarily upon an analy-

4. The dissent quotes language from FPC v. Hope Natural Gas Co., *supra*, 320 U.S. at 602, 64 S.Ct. 281, to the effect that the "method" the Commission uses in deciding upon a particular rate of return is irrelevant if the rate of return is "just and reasonable." In *Hope* the question was whether a particular method of determining the rate base resulted in a fair rate of return. The language from that opinion which the dissent quotes is not very helpful when applied to the requirement that the Commission make adequate findings of fact because without such findings it is usually impossible for the reviewing court to determine whether a given rate of return is "just and reasonable." *See* D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm., 121 U.S.App.D.C. 375, 401–402, 350 F.

2d 753, 779–780 (*en banc* 1965). Thus, to satisfy ourselves of the reasonableness of the rate of return granted by the Commission in this case, we must of necessity make judgments as to the sufficiency of its findings.

5. When Dr. Dorau testified Florida Gas thought that the rate of return which it would actually earn during the "locked in" period would be 6.88 per cent. He was, therefore, asked his opinion only as to the reasonableness of this figure and the 6.5 per cent which Florida Gas used in its original filing. Florida Gas later concluded that its earned rate of return during the period in question would be 6.98 per cent and contended that this rate was fair and reasonable.

sis of the yields of the common stocks of several natural gas companies.[6] (*Id.* at 719.)

After reviewing several earlier rate of return cases, the Eighth Circuit concluded that "much broader discussions and considerations were gone into in other cases than are to be found in the Commission's opinion in the case under review." (*Id.* at 720.) Although the court agreed that comparative yields on common stocks were relevant in determining rates, it did not believe they were so all important as to obviate the need for consideration of such matters as the financial history and position of Northern. (*Id.* at 719–720.) Moreover, it felt the Commission's study of comparative yields was of questionable validity because the Commission had not first weighed Northern's risks against those of the other companies whose yields were compared with Northern's. (*Id.* at 722.) Finally, the court said that the Commission's statement that it had examined all the evidence in the record was not sufficient to show "that the conclusion of the Commission as to the rate of return is the result of the application of the Commission's expertise and judgment * * *." (*Id.* at 723.)

The only difference between the opinion of the Commission reviewed in *State Corporation Commission* and the Docket RP66–4 portion of Opinion 561 is that in the latter the Commission relied upon comparative earnings rather than comparative yields on common stocks.[7] This difference is not significant because comparative earnings, like comparative yields, cannot be applied directly to determine the rate of return for a given company; more intensive economic analysis of the company is required. Thus, in Natural Gas Pipeline Co. of America, 40 F.P.C. 81, 90 (1968), it was held that

actual earnings of other utility companies could be used only to set a ceiling on the rate of return to be allowed. There the Commission said that these earnings "[are] not amenable to a direct translation into a rate of return allowance" because the companies being used for purposes of comparison might have different risks than the company under consideration, might be regulated by agencies with different standards than the Commission, and might have earnings from activities not regulated by any agency. *Id. Accord,* Panhandle Eastern Pipe Line Co., 40 F.P.C. 98, 107 (1968).

Even in Opinion 561 the Commission recognized the dangers involved in using comparative earnings in rate of return determinations. In criticizing Dr. Dorau's testimony as to the proper rate to be allowed in Dockets RP68–1 and RP69–2 it stated:

Dr. Dorau's conclusion is a manifestation of the doctrine that actual earnings of other companies are fair return, which in turn becomes the standard against which lesser returns are to be deemed less than a fair return. But actual earnings of other companies by reason of being earned are not thereby converted into fair return. Among the many difficulties and complexities entailed in comparing earnings in addition to varying capital structures and operational problems, is, in many instances, the necessity to adjust for the upward bias due to the impact of non-utility earnings.

(J.A. 410.) In addition, at the conclusion of its discussion of the RP66–4 rates the Commission said that it "recognized the inherent weakness in the utilization of selected companies for establishing by comparison therewith the appropriate return to be allowed the in-

6. The yield on common stock is the investor's return in dividends on his investment. It is a function of the return on equity and the payment of common earnings. *See* State Corp. Comm. v. FPC, *supra,* 206 F.2d at 719.

7. We feel the Commission's brief references in Opinion 561 to the testimony of Dr. Dorau and to the other evidence presented are no different than its statement in the earlier case that it had examined all the evidence in the record.

stant company." (J.A. 404.) However, the next line of the opinion reads:

> Nevertheless we are persuaded that such evidence does present a basis for which [sic] we may form a judgment. *Natural Gas Pipeline Company.*
> * * * *

Although the Commission cited *Natural Gas Pipeline Company* for this statement, the statement certainly seems to authorize a much greater reliance on comparative earnings than was sanctioned in that case. The Commission thus seems to have ignored its own better judgment and to have relied heavily on the evidence of actual earnings of other utility companies in setting the RP66-4 rate of return.

Even if the Commission did use these rates only to set a ceiling this portion of its opinion, standing alone, would be defective because the other findings and conclusions contained therein are not sufficient to support the Commission's rate of return determination. We must, therefore, consider whether the findings and conclusions located elsewhere in Opinion 561 provide adequate support for the RP66-4 rate determination.

### C. The Remainder of Opinion 561.

The Commission consolidated its discussion of the factors bearing upon the rates of return to be allowed in Dockets RP68-1 and RP69-2. In this discussion it first analyzed the risks involved in Florida Gas' operation and concluded that the company was "no more of a risk than other mature pipelines." (J. A. 413.) It then stated that in setting the rates of return for Dockets RP68-1 and RP69-2 it gave full consideration to the fact that Florida Gas' cost of embedded debt for the period covered by these dockets was a high 6.21 per cent.[8] (J.A. 415.) Next, the Commission quoted fig-

ures which showed that the rate of return on equity allowed Florida Gas was in the lower range of equity allowances given in contested rate of return cases since 1960. (J.A. 417–18.) Finally, the Commission noted with approval that Florida Gas had increased the percentage of debt in its capital structure.[9]

The factors given above are those the Commission normally considers in making rate of return determinations. However, there is no indication that the Commission considered these factors in setting the RP66–4 rates; in fact, all indications are to the contrary. The Commission expressly stated that its discussion of these factors pertained to Dockets RP68–1 and RP69–2. The portion of its opinion containing this discussion was entitled "Overall Rate of Return for Docket Nos. RP68–1 and RP69–2." (J. A. 413.) By contrast, the heading given this discussion and the Commission's use therein of figures pertaining only to the latter two dockets strongly suggest that the discussion was not intended to apply to Docket RP66-4.

This interpretation is borne out by the fact that the Commission did not provide any explanation as to how the figures and analyses given in the last portion of its opinion apply to the RP66–4 rate of return determination. For example, in setting the rate of return in the latter two dockets the Commission apparently relied to some extent upon the increase in the percentage of debt in Florida Gas' capital structure from 64.-46 per cent during the period covered by RP66–4 to 71.73 per cent at the time of the last docket (J.A. 418); it did not, however, indicate how it evaluated the 64.46 per cent figure in setting the RP66–4 rate of return. Similarly, although Florida Gas' cost of embedded debt was high throughout the period cov-

---

8. Florida Gas' cost of embedded debt was high throughout the period covered by these dockets because it "first entered the market approximately ten years ago when debt costs were at the highest point for approximately the twenty years previous." (J.A. 415–16.)

9. Because such increases allow companies to increase their return on equity without increasing their prices, they are viewed favorably by the Commission. Panhandle Eastern Pipe Line Co., *supra*, 40 F.P.C. at 108.

ered by these three dockets, the Commission's discussion of the 6.21 per cent cost of embedded debt does not seem adequate to explain how the 5.55 per cent figure applicable during the period covered by Docket RP66-4 figured in its rate determination in this docket. Without guidance as to how the Commission evaluated the factors of costs of debt and percentage of debt in connection with Docket RP66-4, we cannot be sure it considered them at all. Moreover, even if we were to assume that the Commission considered these factors, we could not properly review its decision because of its failure to explain in sufficient detail the bearing which these factors had on its RP66-4 rate of return determination.

The Commission's statement in the first portion of Opinion 561 to the effect that actual earnings of other utility companies establish a basis for setting rates of return (J.A. 404) is also relevant to our study of the factors relied upon by the Commission in its RP66-4 rate of return determination. As we explained earlier, this statement, in context, seems to indicate that the Commission based this determination in large part upon its analysis of these comparative earnings. The statement thus lends credence to the premise that the Commission ignored many of the factors mentioned later in its opinion in setting the RP66-4 rate of return.

■ Finally, we turn to the Examiner's disposition of Docket RP66-4. The Examiner did not make specific findings on the evidence presented as to this docket. Moreover, he made the revealing comment "that the final answer [as to what is a fair rate of return] is not yet available from this record." (J.A. 367.) The Examiner's failure to make findings and his criticism of the record

do not of themselves render the Commission's rate of return determination invalid. They do, however, provide yet another indication that the evidence Florida Gas presented as to Docket RP66-4 was at no point subjected to intensive analysis by the Commission.

■ Thus, we do not feel that the findings given in Opinion 561 are sufficient to demonstrate that the Commission has "exercised its practical, expert judgment" with respect to the RP66-4 rates here in question. Without the proper guidance from the Commission, we cannot say with certainty that Florida Gas is entitled to a seven per cent rate of return for this docket. The evidence in the record is extensive and lends itself to different interpretations, as is indicated by Chairman White's dissenting opinion. (J.A. 422–28.) It should also be noted that no expert witnesses testified that seven per cent was a reasonable rate of return for this docket; Florida Gas' witnesses addressed themselves only to the 6.5 per cent and 6.88 per cent figures anticipated at the time they testified. (*See* note 5, *supra*.) Since we are not authorized "to substitute our judgment for that of the Commission" (State Corp. Comm. v. FPC, *supra*, 206 F.2d at 722), we must remand the case to the Commission for a more complete statement of the facts and reasons bearing upon its decision.[10]

### III. The Need for a Hearing

■ The only remaining question is whether the Commission should offer Sun Oil a hearing on remand. Sun has not specifically requested a hearing, but it has raised the issue by implication with its contention that it did not waive any rights by failing to oppose the merits of the 6.5 per cent rate of return

---

10. Sun Oil would have us go further. It contends that the evidence presented by Florida Gas does not justify a rate of return greater than 6.5 per cent and asks that we order the Commission to adopt this figure. (Brief for Appellant at 17.) However, the evidence in the record is not sufficient to demonstrate conclusively that either 7 per cent *or* 6.5 per cent is the proper rate of return for the period covered by Docket RP66-4. Consequently, we have no alternative but to remand the case to the Commission for further findings.

when the case was before the Hearing Examiner. (Reply Brief for Appellant at 11.) Sun technically had two opportunities to present evidence and arguments to the Examiner, but it is questionable whether either of these was sufficient to provide it a fair hearing as to the rate of return to be allowed in Docket RP66–4. Sun claims that it was not notified that the rate of return issue was to be contested at the hearing which was held. (Reply for Appellant at 11–13.) According to Sun, statements made at the prehearing conference and in the Examiner's report of this conference misled it into believing that all parties were satisfied with a 6.5 per cent rate of return and would not raise this issue at the hearing. (*Id.* at 11.) Contrary to Sun's allegation, the transcript of the prehearing conference and the Prehearing Conference Report indicate that Florida Gas did not agree to the 6.5 per cent rate of return. (J.A. 101, 339.) However, these documents also reveal that the Examiner had decided at the time of the prehearing conference that this was the proper rate to be granted. (*Id.*) Although he allowed Florida Gas to introduce evidence for use on appeal (J.A. 339), he stated that he himself was not going to "study [the rate of return issue] any more." (J.A. 101.) Obviously, the Examiner later reversed his position. In these circumstances Sun might well have been confused as to whether the RP66–4 rate of return was to be contested at the hearing. The Examiner must have felt so, because in his opinion, written after the hearing, he stated that "further proceedings must be afforded [on the RP66–4 rate of return], in fairness to all sides." (J.A. 368.)

The issue thus becomes whether the Examiner remedied the deficiency in the original hearing by granting Sun Oil 30 days after the issuance of its opinion in which to file "any appropriate counterpleading and evidence." (J.A. 374.)

Sun contends that, far from providing it the opportunity for a fair hearing on the rate of return issue, this action on the part of the Examiner shifted the burden of proof from Florida Gas to Sun in violation of section 4(e) of the Federal Power Act, 15 U.S.C. § 717c(e) (1964). While we do not feel the facts are sufficient to establish that the Examiner ignored the statutory mandate as to the placing of the burden of proof, we do feel he placed Sun in a very delicate position. It was forced to present complicated economic evidence and arguments in a relatively short time; the 6.-98 figure, which the Examiner admitted might not be the "final answer" (J.A. 367), was to be adopted if it failed to do so. Perhaps these considerations would not appear persuasive if the issue of the adequacy of the hearing afforded Sun Oil had been argued more extensively before us. In the present posture of the case, however, we feel they provide sufficient reason for us to require the Commission to grant Sun an opportunity to be heard on the question of the rate of return to be allowed in Docket RP66–4.

The dissent contends that offering Sun a hearing is unnecessary because Sun does not want to introduce evidence bearing upon the rate of return in Docket RP66–4. This may be the case; if so, nothing will establish it more quickly than by offering Sun what is unquestionably a fair hearing. We prejudice no party by requiring this hearing, and we may well avoid another time-consuming appeal.

Reversed and remanded for proceedings consistent with this opinion.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

In this rate proceeding the Federal Power Commission, in agreement with its hearing examiner, determined that a rate of return of 7 per cent should be allowed Florida Gas Transmission Company[1] for a locked-in period from No-

---

I. Florida Gas Transmission Company is a pipeline which transports gas to Florida Power Corporation and Florida Light & Power Company from producing areas in Texas and Louisiana.

vember 1, 1965 to June 9, 1968. In effect, as the majority opinion makes clear, the Commission was really deciding whether Sun Oil Company was entitled to a refund from Florida Gas of over $1,000,000 on gas purchased during the locked-in period.[2] In the proceedings before the examiner and the Commission, Sun Oil took the position that Florida Gas was legally estopped[3] from claiming a rate of return greater than 6.5 per cent, which rate would have netted Sun Oil the $1,000,000 refund. Sun Oil refused to cross-examine the rate of return evidence put in the record by Florida Gas or put in an answering case or evidence of its own. Even after the hearing examiner announced that Florida Gas had made out a *prima facie* case for a 6.98 per cent rate of return and gave Sun Oil 30 additional days to present evidence, no evidence was forthcoming.

Obviously Sun Oil could neither successfully challenge the evidence of Florida Gas nor produce adequate evidence of its own. Otherwise it certainly would have done so. For a party in a rate case to rest on a legal point alone when it had substantive evidence on the merits would be the height of folly, and a responsible company like Sun Oil does not usually hire foolish lawyers. Moreover, Sun Oil's legal point was so weak it was abandoned in this court. Yet the majority here holds, in line with Sun Oil's new tactic, that the Commission failed to make adequate findings in a case uncontested on the merits. The court then remands the case, not just for findings, but to reopen the record to allow Sun Oil to put in rate evidence. Ordering the Commission to reopen the record to allow Sun Oil to put in rate evidence is particularly remarkable because Sun Oil does not even ask for this relief or even

suggest it now has rate evidence to put in. Thus this age-old administrative proceeding is started all over again to give Sun Oil a third bite at the apple, it having refused the first two in a tactical ploy born of desperation.

The rate of return allowed by the Commission should cover imbedded debt costs and provide the equity holders with an adequate return on their investment in the pipeline. F.P.C. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Here one of the two components of the rate of return is known and undisputed: the actual cost of debt during the locked-in period was 5.66 per cent. Thus the only determination to be made by the Commission in this case and reviewed by this court is a fair return on equity. The Commission found that fair return to be 9.36 per cent which, together with the undisputed imbedded costs, resulted in a rate of return of 6.98 per cent, rounded off at 7 per cent.

The classic statement of the standard to be applied in determining a fair return on equity is found in *Hope Natural Gas, supra,* 320 U.S. at 603, 64 S.Ct. at 288: "* * * [T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." That standard has, of course, been followed by this court. Williams v. Washington Metropolitan Area Transit Com'n., 134 U.S.App.D.C. 342, 353–354, 415 F.2d 922, 933–934 (1968). Because of the amorphous character of the area in which it applies, the standard is of necessity a generalized one, allowing great discretion to the Commission in its ef-

2. Sun Oil's interest in the proceeding stems from the fact that under the terms of its gas sales contracts Sun Oil is required to absorb portions of increases in transportation charges made by Florida Gas, those charges being subject to Commission approval.

3. The legal estoppel argument was based on Sun Oil's allegation that the Commission was bound by the 6.5% rate of return figure used in the Florida Gas application for a rate increase. The Commission rejected this argument, and it is not made here.

fort to weigh the competing subtle and technical considerations in determining a fair return on equity. Consequently, in this area judicial review "is necessarily narrow. These matters are properly for the Commission, and its determination is to be disturbed for only the most basic forms of abuse." Battle Creek Gas Co. v. F.P.C., 108 U.S.App.D. C. 209, 213, 281 F.2d 42, 46 (1960). I find no such abuse here.

In making its judgment as to fair return on equity here, the Commission explicitly applied the *Hope Natural Gas* standard and made the necessary findings. Of course, the findings could have been more detailed. But as the majority indicates, the Commission docket on which this appeal is based was a relatively small part of a much larger and more traditional rate making proceeding involving these same parties. The Commission's decision and order covered the entire proceeding. Moreover, as already indicated, the issue on review here was not even contested on the merits before the Commission. While it is true that in fixing rates the Commission must comply with the statute whether the proceeding is an adversary one or not, where the rate fixing is unopposed on the merits the need for the same punctilious regard for the procedural requirements is not as apparent. Certainly it does not come in good grace from a party who has not contested the merits to shift gears on judicial review and complain that the Commission has not dotted all the required i's and crossed all the required t's. Administrative proceedings, like court trials, are not games for lawyers. The pursuit of truth and fairness in either forum is not advanced by craftsmanship unrelated to the ends of justice.

In this connection it is interesting to note that in the other two parts of the Commission's order not on review the Commission fixed a return on equity for Florida Gas at 9.9 per cent as compared to the 9.36 per cent here. As to those dockets the Commission relied on similar data and made similar findings, yet Sun Oil does not challenge the rate set or the return on equity. If the Commission's action in those dockets satisfies the *Hope Natural Gas* standard, it is difficult, at least for me, to understand why the Commission's action in the docket in suit does not. If the Commission's procedures there pass muster, I am at a loss as to what the application for review here is all about.

In any event, the record here fully supports the Commission's findings which, though lacking in detail, are completely adequate when taken with those of the examiner adopted by the Commission. In allowing Florida Gas 9.36 per cent return on equity, the Commission followed the same pattern of decision as in all its pipeline rate of return cases since 1960. As the Commission indicated, in about three fourths of the contested cases during that time, the equity return allowed was 9.5 per cent or more.[4] The Commission issued three rate of return decisions within the year prior to the issuance of its opinion on review and one within six months thereafter.[5] All of these decisions are completely consistent with the one here, not only as to rate of return on equity, but on the type of evidence produced and the findings

4. *See* Tennessee Gas Transmission Co., 24 FPC 204, 209 (1960) (10.12%); United Gas Pipe Line Co., 25 FPC 26, 32, 116 (1961) (10.3%); Northern Natural Gas Co., 25 FPC 431, 441–442 (1961) (10.-5%); Kansas-Nebraska Natural Gas Co., 25 FPC 448, 452 (1961) (10.8%); Panhandle Eastern Pipe Line Co., 25 FPC 550, 551 (1961) (10.47%); Alabama-Tennessee Natural Gas Co., 27 FPC 1180, 1189–1190 (1962) (7.5%); American Louisiana Pipe Line Co., 28 FPC 482, 485 (1962) (9.57%); Natural Gas Pipeline Co. of America, 40 FPC 81, 93 (1968) (9.52%); Panhandle Eastern Pipe Line Co., 40 FPC 98, 111 (1968) (11.18%).

5. *See* Natural Gas Pipeline Co., of America, *supra* Note 4; Panhandle Eastern Pipe Line Co., *supra* Note 4; Cities Service Gas Co., 40 FPC 1033 (1968); Algonquin Gas Transmission Co., 43 FPC (issued January 19, 1970).

made. In fact, in all of them the allowance for equity holders was in excess of 9.36 per cent.

The Commission also found that 9.36 per cent equity return is consistent, not only with the return allowed other pipelines, but with the return allowed electric utilities and the Bell System.[6] The record before the Commission also included complete equity return data on six principal industry groups [7] outlined and explained as it relates to this case by a witness admittedly expert in the field. Thus the record as a whole completely supports the Commission's findings and decision. Fortified with the pertinent economic and financial facts bearing on equity return on investments in similar enterprises having corresponding risks and guided by the *Hope Natural Gas* standards, the Commission has made its findings and rendered its decision in this case. An agency's findings need not be in separate numbered paragraphs. Even under Rule 52, Fed. R.Civ.P., District Court findings may be in the narrative form of "an opinion or memorandum of decision." No reason appears why agency findings should be more formalized. Since the agency findings here are clearly discernible from the Commission's decision, and since those findings adequately set out the basis for the Commission's order, in my judgment the law requires that we let that order stand.

We should remember the basic teaching of *Hope Natural Gas:*

"* * * If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. * * *"

320 U.S. at 602, 64 S.Ct. at 288. Sending this case back to the Commission, in my opinion, is an exercise in wheel-spinning. There is no real possibility that Sun Oil will get the $1,000,000 it claims. The record in this case and the result in almost every other pipeline case before the Commission support the Commission's order under review. Moreover, on remand the Commission in good conscience could not set a return on equity lower than the 9.36 per cent in this case when in the same proceeding between the same parties, involving the same gas, albeit for a slightly later period, the Commission has set a return on equity of 9.9 per cent which is not even contested on review.

I respectfully dissent.

6. The Commission in Paragraph 29 of its opinion and order stated:
   "The evidence reveals that selected electric utilities during the four years preceding the locked-in period involved herein earned overall rates of return averaging slightly over 7 percent. The exhibit also reveals that the Bell System in 1965 had an overall return of approximately 7.66 percent, allowing equity a return of 9.37 percent. Earnings of selected natural gas distribution companies in 1965 averaged 7.64 percent overall with earned equity return averaging 13.48 percent. The data regarding selected natural gas transmission companies shows that for the year 1965 the average earned rate of return was 7.59 percent with equity earning an average of 14.69 percent."

7. Moody's 24 Electric Utilities, Class A and B Electric Utilities, Bell System (AT&T), Moody's 125 Industrials, Moody's 10 Natural Gas Distribution Companies, and Moody's 10 Natural Gas Transmission Companies.