**EL PASO NATURAL GAS COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION.**
Respondent.

No. 30896.

United States Court of Appeals,
Fifth Circuit.

Oct. 19, 1971.

Leon M. Payne, Houston, Tex., Walter G. Henderson, G. Scott Cuming, Vice President and Gen. Counsel, Harris S. Wood, El Paso, Tex., P. Dexter Peacock, Andrews, Kurth, Campbell & Jones, Houston, Tex., C. Frank Reifsnyder, Hogan & Hartson, Washington, D. C., for petitioner.

Gordon Gooch, Gen. Counsel, J. Richard Tiano, Asst. Sol., Abraham R. Spalter, Asst. Gen. Counsel, John F. Harrington, Atty., F.P.C., Washington, D. C., for respondent.

John Ormasa, Philip S. Paul, Kenneth Richard Edsall, Los Angeles, Cal., for So. Cal. Gas Co.

Mary Moran Pajalich, Lawrence Q. Garcia, Michael J. Stecher, San Francisco, Cal., for People of the State of Cal. and the Public Utilities Comm.

Jon T. Brown, Wallace L. Duncan, Washington, D. C., for the Salt River Project.

Frederick T. Searls, Malcolm H. Furbush, Daniel E. Gibson, San Francisco, Cal., for Pacific Gas & Electric Co.

Sherman Chickering, C. Hayden Ames, Donald J. Richardson, Jr., San Francisco, Cal., for San Diego Gas & Electric Co.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

In this Title IV petition for review,[1] El Paso Natural Gas Company (El Paso), a natural gas transmission company, challenges opinions of the Federal Power Commission (Commission) which decided phases of two successive rate increase applications. Three issues are raised by El Paso: (1) it asserts the Commission's method of calculating prepaid gas supplies [2] in its first filing was erroneous; (2) it contends that the Commission should not have eliminated stock from El Paso's capital structure that was issued in exchange for the assets of nonregulated enterprises engaged in the wire and textile business, which assets were

---

1. F.R.A.P. 15–20.

2. The amount of gas paid for but not yet actually taken.

continued in the same business uses as wholly owned subsidiaries; and (3) it faults the Commission's determinations of the proper rate of return for (a) failure to utilize the comparable earnings and capital attraction tests as an ultimate check on justness and reasonableness, (b) rejecting comparative capitalization and return data from industries other than those engaged in pipeline activities, and (c) failure to explicate the manner in which data was utilized or to articulate the reasoning by which the determinations were reached.

In September 1968, El Paso requested the Commission to approve increased rates for its regulated activities. This request was assigned Docket No. RP 69–6. After a public hearing, the matter was divided into phases. In the present appeal, we are only concerned with a part of the issues assigned to Phase I of this first docket—the percentage of return on capital which the rates applied for should generate, and the method to be followed in calculating prepaid gas supplies. El Paso contends that the Commission erroneously excluded from the computations a part of its equity capital and that it was entitled to a higher rate of return than the Commission allowed. In an issue which is pertinent only to this first docket, El Paso figured its prepaid gas supplies by taking the average of the beginning and ending balances for a one-year period. The Commission refused to accept this calculation and instead based its order on the average of the 13 monthly balances for the same annual period.

In October 1969, El Paso filed another rate increase proceeding which was docketed as RP 70–11. It, too, was a phased hearing. The only pertinent issues now before this court relate to the rate of return allowed. El Paso continued to complain of the exclusion of a part of its capital structure and claimed it was en-titled to an even higher rate than the increased rate specified by the Commission for this filing.

*Calculating Allowable Prepaid Gas Balances.* Under the regulations of the Commission, El Paso was required to file a number of detailed statements including one showing the working capital it claimed, which working capital statement could include an allowance for the average of 13 monthly balances of prepayments for gas.[3] The regulations further provided that El Paso's various statements should be based upon a "test" period consisting of a "base" period of 12 consecutive months of the most recent available actual experiences "[a]djusted for changes in revenue and costs which are known and are measurable with reasonable accuracy at the time of the filing, *and* which will become effective within nine months after the last month of available actual experience utilized in the filing, * * * *".[4] (emphasis supplied) It is undisputed that the 12-month base period of the most recently available actual experience for this first filing ended May 31, 1968, and that El Paso's prepaid gas balances for the base period amounted to 30,715,275 dollars. El Paso suggests that the adjustment to this calculation, necessary to convert this base period to a test period as required by the Commission's regulation, should be determined by taking the amount of prepaid gas supplies recorded on its books on December 31, 1967, as averaged with El Paso's *estimate* of prepaid gas supplies it would have on hand December 31, 1968. This two-figure average was calculated to be 59,787,211 dollars. The Commission refused to accept this average of only two figures, but did ultimately agree to use the average of the 13 monthly balances actually recorded on El Paso's books for the December 1967 through December 1968 period, which resulted in a calculation of 48,388,017 dollars.[5] El Paso now con-

---

3. 18 C.F.R. § 154.63(f) [Statement E—Working Capital].

4. 18 C.F.R. § 154.63(e) (2).

5. The actual amounts for the period from June 30, 1968 through December 31, 1968, were known to the Commission from El Paso's subsequent rate increase filing in

tends, in the alternative, that the Commission should have utilized a 12-month test period from February 29, 1968 through February 28, 1969, for the computation of its monthly balance average. Both its original and alternative contentions are bottomed upon the premise that its methods more nearly approximate what the facts now show to be correct forecasts.[6]

■ We find El Paso's demonstration that subsequent events have proved its prepaid gas balances have continued to increase both during the period when the rates authorized in Docket RP 69–6 were collected and since that period, to be unpersuasive as a basis for reversing the Commission. Ratemaking is not a science. It is not to be adjudged correct or incorrect by hindsight court application of facts developed by future events. Congress provided no formula for the Commission to follow in calculating this particular prepayment or any other part of working capital. In such a situation a court would not be warranted in rejecting the formula employed by the Commission unless it plainly contravenes the statutory scheme of regulation. Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1944). The regulations adopted by the Commission do not contravene the statutory scheme. In fact, El Paso attacks their application rather than their content.

■ Since such application was not shown to be arbitrary or inconsistent, this attack must fail. Rather, El Paso's initial approach, which seeks to substitute an average of only two figures for an average of 13, would be incompatible with other working capital calculations in that it would give one-half year's weight to the opening and closing figures of this one particular prepaid account. The hazard of such a course is demonstrated by the fact that El Paso's average figure exceeds 10 of the actual monthly balances in the period involved. In the absence of clearly arbitrary action, it is both necessary and proper that courts leave to the Commission's expertise the determination of which methodology is to be used in developing formulae for adjustments to the rate base test period. Court interference, particularly as to a single item in a comprehensive schedule, would not only be contrary to the regulatory power vested in the Commission by the Congress, but could well destroy the proper statistical relationship between operating expenses and revenues, which is the core determination of proper ratemaking.

■ In its alternative contention, El Paso insists that the test period for adjustment of its base period data should properly have ended February 28, 1969, rather than December 31, 1968, and points out that only the February date would allow a full nine months of "adjustment" to the base period ending in May 1968. However, the record shows that in the Phase I proceedings of Docket RP 69–6 El Paso itself made adjustments to prepayments through the seven-month period ending in December of the same year. We cannot reverse the Commission for utilizing the period selected by the applicant, especially since it appears that this was the period used in common for calculating all components of the rate base, and that such a February to February contention was not raised in any proceedings before the Commission.

■■ Furthermore, we do not read the quoted portion of the regulations as requiring an applicant or the Commission to always utilize the nine months following the base period for test period adjustment. Rather, the regulation establishes the nine-month period as a maximum and conjunctively requires that the

Docket RP 70–11. Incidentally, this second filing disclosed that El Paso's estimate of its December 31, 1968 balance was 6,350,000 dollars too high.

6. The figures now available demonstrate that El Paso's prepaid gas balances climbed by approximately 15 million dollars in the last months of 1967, then remained relatively constant near the 40 million dollar level for most of 1968, and then increased to over 70 million dollars in the last three months of that year.

revenues and costs in any test period must be known and measurable with reasonable accuracy at the time of filing to be utilized at all. Finally, the fact that the Commission has tentatively agreed to allow El Paso to utilize the full nine-month period for similar calculations in Phase I of the succeeding docket does not demonstrate that the use of the seven-month period complained of in Docket RP 69–6 was arbitrary or inconsistent. If the adjustment is consonant with the other calculations and data in Docket RP 70–11, it may ultimately be accepted in Phase II of that proceeding with propriety. But that this is so does not control our approval of what was done in RP 69–6.

■ *Exclusion of Common Stock Assignable to Non-Regulated Activities.* In 1967 El Paso acquired the assets of Beaunit Corporation, a textile company, and Narragansett Wire Company in exchange for 75,783,311 dollars worth of El Paso common stock. Neither of these corporations was engaged in any publicly regulated activity. The assets of each company have been utilized since acquisition as distinct subsidiaries of El Paso.

The Commission made specific and separate findings in both docket proceedings regarding the portion of test period capitalization applicable to debt, to preferred stock, and to common equity. This equity figure was reduced in both dockets by the dollar amount of the stock exchanged for such assets. The format of the Commission's findings, which discloses the form of procedure it used is set out as follows:

| | Docket No. RP69–6 | | | Docket No. RP70–11 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Capital Ratio | Allow-ance | Return | Capital Ratio | Allow-ance | Return |
| Debt ...... | 70.19% | 5.44% | 3.8183% | 71.74% | 5.94% | 4.2613% |
| Preferred Stock ... | 7.43 | 5.13 | .3812 | 6.60 | 5.13 | .3386 |
| Common Equity .. | 22.38 | 13.35 | 2.9880 | 21.66 | 13.68 | 2.9626 |
| | | | 7.1875% | | | 7.5625% |

El Paso complains that this exclusion of a part of its equity capital amounted to a form of "dollar tracing" which overlooks economic reality since investors appraise a company as a whole when considering loans or investments. It points out that the Commission itself, in a recent trial proceeding, cautioned El Paso to thicken its common equity, that the stock-for-assets exchange with Beaunit and Narragansett complied with that caveat as effectively as if the stock had been exchanged for cash, and that borrowing by El Paso was made easier and less expensive because these assets took the form of common stock and thus became junior to lenders' equity. El Paso also asserts that the deletion of the worth of this stock causes the percentage of total capital assigned to common equity to be reduced and the percentage assigned to debt to rise. The effect of this reduction and increase on the company's rate of return is asserted to be twofold: (1) a larger value is assigned to the lower rate allowance given debt, and (2) the higher return attributable to debt will cause the amounts allowed for income tax in Phase II of these dockets to be reduced by more than 4,000,000 dollars.[7]

7. This is so, it asserts, because the return paid out to stockholders receives a tax adjustment, whereas the sum paid as interest on debt is a business expense which is not taxable.

The Commission responds that the policy of the Act giving it authority over power-related activities prohibits consideration of such clearly separable non-regulated business and that this adjustment equitably balances consumer and stockholder interests. It does agree that El Paso's common equity, as reduced, is "thin" but asserts that to offset this condition a higher than usual overall rate of return was allowed. The Commission also agrees with El Paso that it has eschewed attempts at "dollar tracing" in integrated corporations. However, it contends that no such tracing is involved in this case because the non-utility acquisitions and operations are so clearly severable. El Paso's assertion regarding the indirect impact of this capital exclusion on Phase II income tax allowances is contested on the grounds, first, that the debt ratio cannot be employed to determine interest and thus the asserted tax consequence is legally erroneous; and second, that the merits of the Phase II portions of these dockets should not be assessed in this appeal.[8]

The Commission and Court decisions relied upon by El Paso[9] are all distinguishable. Four of these decisions involved refusal to separate wellmouth property values or to attempt segregation or cost classification of petroleum production facilities which were totally integrated into the economic being of the corporation. The other concerned the attribution of interest to noninterest bearing installment notes given to purchase petroleum production. In this last proceeding, although segregation of the attributed interest factor was fiscally possible, the Commission determined the overall financial ability of the company was pledged to meet these payments and that it was therefore proper to attribute the interest factor to the general affairs of the company.

The procedure followed in the instant case of separately determining the portions of a company's capital structure related to debt, to preferred stock, and to common equity, and separately assessing a fair and reasonable return based upon differing allowances to each of these segments, is the common and accepted practice for this phase of ratemaking. Under such a procedure the Commission must perforce determine the appropriate amounts to be included in each category. Here, distinctly non-utility properties were acquired in a clearly separable transaction; these assets have thus far been kept as separate operating subsidiaries rather than being merged into the corporate hodgepodge; and no showing has been made that their respective financial affairs have yet become intermingled. Thus, the Commission was warranted in assuming that a potential shareholder or lender-investor could determine the value of the regulated versus the non-regulated operations and calculate the sureness of his regulated return on the one and the commercial risk he assumes on the other. When the Commission establishes a fair rate of return on the clearly distinct utility operations as a whole, it has acted justly and reasonably both toward the investor who should expect to receive a return based on that known utility investment, and toward the rate payer whose payments must generate such return. Cf: FPC v. Hope Natural Gas Company, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944) and Southern Louisiana Area

---

8. After briefing, but before oral argument, Phase II was decided, and this Court has been furnished with a copy of the Commission's decision. It does reflect that El Paso continued to object to this common stock exclusion because it did have an affect on the tax allotment, but it also reflects that the sum of the tax adjustments allowed was a product of many factors other than the debt-equity function which this particular exclusion caused.

9. Panhandle Eastern Pipeline Company v. FPC, 113 U.S.App.D.C. 94, 305 F.2d 763 (D.C.Cir.1962), cert. denied 372 U.S. 916, 83 S.Ct. 719, 9 L.Ed.2d 722 (1963); Texas Eastern Transmission Corporation, 42 FPC 376 (1969); El Paso Natural Gas Company, 28 FPC 688 (1962); Continental Oil Company, 27 FPC 96 (1962); and Phillips Petroleum Company, 24 FPC 537 (1960).

Rate Cases v. FPC, 428 F.2d 407 (5th Cir. 1970) n. 88 at 435. We say no more than that the intent of the Natural Gas Act is to require that the rate of return developed by the Commission be based only upon the capitalization which a regulated company devotes to public service, where non-public segments of such capital can be distinctly identified and surely isolated.

It is important to note here the absence of any sweeping generalizations or even a categorical statement that the Commission will be justified in excluding the capitalization of these El Paso subsidiaries for any specific time in the future. We do, however, hold without hesitation that the Commission's action in making these exclusions from capital in each of the dockets presently on appeal was within the ambit of the Commission's broad discretion in dealing with this novel situation. *Cf.* Southern Louisiana Area Rate Cases, *supra*, particularly Part I A at 418.

As previously stated, the Commission expressly took note of the thinning effect which this elimination had upon the company's common equity. Precisely because the resultant equity was diluted with a resultant hazard to attracting capital, a higher overall rate of return was allowed. In fact, in Docket RP 70–11 the rate was described by the Commission as the highest allowed in recent years. The means chosen to cope with this unique situation were reasonable and, therefore, uniquely committed to the Commission's discretion.

*Determination of Rate of Return.* El Paso mounts a three-pronged attack on the Commission's allowance of an overall rate of return of 7.125%, as opposed to the requested 7.5%, in its initial filing, and 7.5625%, rather than 8.25%, in the subsequent docket. The first contention is that the Commission failed to properly follow and apply the rationale of Bluefield Waterworks and Improvement Company v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) and FPC v. Hope Natural Gas Co., supra.

■ In its reply brief and in oral argument El Paso emphasized that it was not contending that these decisions had the effect of requiring the Commission to use only the comparable earnings and attraction of capital tests.[10] Rather, it asserts its position would allow the Commission to arrive at a rate determination by any means it might choose as appropriate, provided it must *ultimately* demonstrate that the rate established meets the comparable earnings and attraction of capital tests before declaring the rate to be just and reasonable.

The Commission, on the other hand, takes the position that these tests are neither the sole nor the ultimate determinants; and that its methods complied with the Act, as it has been interpreted by the courts, because the end result of the methods it used was a just and reasonable rate of return and the procedures it followed were demonstrably in keeping with the purposes of regulation. This Circuit is committed to the Commis-

---

10. *Bluefield* stated the comparable earnings test in this language:

A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties * * *. (262 U.S. at 692, 43 S.Ct. at 679)

That same case described the attraction of capital test as follows:

The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. (262 U.S. at 693, 43 S.Ct. at 679)

The *Hope* decision stated the comparable earnings test in this language:
* * * [T]he return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. (320 U.S. 603, 64 S.Ct. 288)

**1252**

sion's position. *See* Southern Louisiana *Area Rate Cases, supra,* n. 38 at 424 and n. 87 at 435. *See also* Tenn. Gas Transmission Co. v. FPC, 293 F.2d 761 (5th Cir. 1961), aff. in part and, on other grounds, partially reversed 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962); and Bonbright, Principals of Public Utility Rates, 257 (1961).

It would subvert the established rule in this Circuit to follow El Paso's contention that, while the Commission may be allowed to calculate a just and reasonable rate of return by any methods it chooses, its determination is vacuous until it passes the comparable earnings and capital attraction tests. If we were to hold that these two tests or either of them are really the *sine qua non,* then the other criteria applied by the Commission would be mere academic exercises. Such an approach is circumlocutory.

■ The second prong of this part of El Paso's attack excepts to the Commission's refusal to base a rate of return allowance on a comparison of El Paso's economic position with that of certain electrical utility companies and the American Telephone and Telegraph Company. The Commission's opinion states only that such financial comparisons have limited use in rate-making for the pipeline industry. While this language indicates some consideration may have been given to these figures, we assume, for the purpose of our decision here, that they were entirely excluded from the decision-making processes. On the other hand, the Commission assigned a considerable weight to the allowances it had made to five other pipeline companies in recent ratemaking proceedings, but with the added caveat that these prior allowances were not controlling since the rate of return allowed was to be based upon the record developed in each individual case.

We find no legal fault with the course pursued by the Commission. Since it is not contended that its findings are without the support of substantial evidence, they must stand.[11] This is not to say that, as a matter of law, the Commission cannot consider financial comparisons with non-regulated industries, or that it must consider only comparisons with rates previously fixed for regulated businesses. What we hold is that the Commission ought not to be court-bound to always follow either course.

■ The final salient puts forth the contention that the Commission neither set forth the manner in which it made use of the data relied upon nor did it articulate its reasoning in a manner sufficient to pass muster under the Administrative Procedure Act, 5 U.S.C.A. § 551 et seq., § 701 et seq. (1967), and to enable meaningful court review. An examination of the Commission's opinions demonstrates this contention is without merit. The record in this docket approximated 10,000 pages in length. This included not only El Paso's elaborate presentation but studies by the Commission staff, a lengthy and detailed decision by a hearing examiner, and thorough and careful opinions on the initial hearing and on rehearing by the Commission. We refuse to myopically limit our review to the Commission opinions in isolation. They must be viewed *in pari materia* with the other materials contained in this record to which they refer and upon which they depend. Using this approach, we have no difficulty in determining that the decisions adequately disclose the basis and reasoning for the rate determinations made.

The Commission gave weight and effect to earnings-price and earnings-book ratios, capitalization, cost of capital and generation of net income. It rejected comparative data from other companies as solely controlling. It considered El Paso's strong relative position among other pipeline companies, its market, its ability to maintain its financial integrity, its ability to meet the impact of increas-

11. 16 U.S.C.A. § 825*l*(b) (1960). *Cf.* Colonial Stores, Inc. v. FTC, 450 F.2d 733 (5th Cir. 1971).

ing capital costs, and the relative amount of its equity capitalization. It made clear that the evidence on discounted cash flow methods of predicting the company's future financial status were not considered. It likewise made clear that no additional allowance would be made to El Paso because of the results of the anti-trust violation divestiture that had been recently required. The Commission further explicated its use of the earnings-price ratio consideration as embodying a weighing of the effect on investors from the standpoint of expectation of earnings, dividends, an increased stock price in the future, and the general outlook for the company and the industry. The Commission plainly stated that it did not arrive at its determinations based wholly upon other pipeline industry earnings data. With regard to its rejection of the earnings of the suggested electric utilities and American Telephone and Telegraph Company, as the controlling basis for consideration the opinion on rehearing shows by analysis, that even had the Commission considered and utilized these facts, the ultimate determination of the Commission would not have been affected.

The Commission is not required to reiterate the detailed process by which every conclusion of the examiner or opinion of an expert witness which it adopts was deduced. What we find the Commission has done in these dockets is to qualitatively inform the reader who is familiar with the intricacies of the rate-making process, which concepts were accepted, which were rejected and what final decision was reached. Certainly it is not a deficiency for the Commission's determination to be couched in regulatory, financial and accounting argot. While these terms may give some difficulty to the uninitiated, they speak directly and fully to El Paso's competent personnel and its able counsel. The holding and its reasoning are made "plain upon tables, that he may run that readeth it." We do not find any such reversible vagueness or deficiency in the present orders as was found present in another Commission decision reviewed by our sister circuit in Sun Oil Co. v. FPC, 445 F.2d 764 (D.C.Cir.1971).

The decision of the Federal Power Commission is

Affirmed.