Mystic Valley Gas Company *vs.* Department of Public Utilities (and two companion cases).

Suffolk. April 6, 1971. — May 3, 1971.

Present: Tauro, C.J., Cutter, Reardon, Quirico, & Braucher, JJ.

*Gas Company. Public Utilities. Equity Jurisdiction,* Public utilities. *Equity Pleading and Practice,* Review of order of department of public utilities. *Constitutional Law,* Public utilities.

A public utility has a constitutional right to judicial review of both the law and the facts on the issue whether a rate established by the Department of Public Utilities is confiscatory. [424]

A regulated public utility has a constitutional right to earn enough revenue to cover its operating expenses and its capital costs. [424]

In a suit in equity by a gas company under G. L. c. 25, § 5, to review a decision of the Department of Public Utilities on November 28, 1969, disallowing rates filed by the petitioner, where it appeared that the petitioner was a corporate entity with minority public stockholders separate from a gas and electric system holding almost all of its stock and almost all the stock of other gas and some electric companies, that the system was a party to a "divestment" proceeding before the

Securities and Exchange Commission which probably would result soon in the system relinquishing its shareholdings in gas companies, that the petitioner had a capital structure of 61.8% debt and 38.2% common stock, that for a number of years it had obtained additional debt financing by short term borrowing at or near the "prime rate" at a favorable cost as compared to borrowing by long-term bonds, and that it had "no plans to issue [additional] mortgage debt in the immediate future," this court held that in the circumstances it was error for the department "to use as a guide" the capital structure of the system in computing rates for the petitioner, and to attribute to it a hypothetical capital structure of 60% debt, 9% preferred stock, and 31% common stock. [424–433]

With respect to a gas company which since 1960 had financed new construction exclusively by debt, which was a member of a gas and electric system subject to a "divestment" proceeding before the Securities and Exchange Commission, and which by the end of 1968 had an actual capital structure, developed with the acquiescence of the Department of Public Utilities, of approximately 50% debt and 50% common equity, this court in the circumstances saw no such variance from good practice as to permit the department, while considering rates filed by the company, to disregard such structure, to substitute a hypothetical capital structure, and to disallow the company's rates. [433–434]

In suits in equity under G. L. c. 25, § 5, to review decisions of the Department of Public Utilities, disallowing rates filed by gas companies, where it appeared that the evidence and the department's meager subsidiary findings left it in doubt whether the department, in using 1968 as a test year to measure the companies' respective revenue requirements, rightly declined to adjust the test year results to reflect fully wage increases in April, 1968, and April, 1969, and that the cases in any event must be reconsidered by the department, it should then determine, in the light of actual 1969 and 1970 figures and returns available, whether the wage increases required adjustments of test year results or rate allowances [434–436]; upon reconsideration the department also should further consider its refusal to adjust the test year's result to reflect increased municipal tax rates for 1969 on properties which were added to the companies' plants in 1968 and first assessed as of January 1, 1969. [436–437]

PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on January 23, 1970.

The cases were reserved and reported by *Quirico*, J.

*Lane McGovern* (*Donald W. Glazer* with him) for the petitioners.

*Charles K. Mone*, Assistant Attorney General (*Walter H. Mayo, III*, Assistant Attorney General, with him) for the Department of Public Utilities.

CUTTER, J. These three appeals seek review (G. L. c. 25, § 5, as amended through St. 1956, c. 190) of orders of the department (D.P.U.) entered on November 28, 1969, in rate proceedings brought by Mystic Valley Gas Company (Mystic), North Shore Gas Company (North Shore), and Lynn Gas Company (Lynn). Each company[1] has appealed separately from the order affecting it. A single justice reserved and reported each case for the decision of the full court upon the evidence before the D.P.U.

## GENERAL BACKGROUND.

Each company "was part of . . . New England Electric System [N.E.E.S.], which includes, in addition to . . . eight gas companies, Massachusetts Electric Company, Narragansett Electric Company, and New England Power Company, as well as the parent company" (N.E.E.S.). The D.P.U. in its decisions states, "Although there is a small minority [common stock] interest in some" of the N.E.E.S. constituent gas operating companies, "for all practical purposes there is no market for . . . [their] stock . . . almost all of which is held by" N.E.E.S. That system, however, is a party to "divestment" proceedings before the Securities and Exchange Commission (S.E.C.) which may result in the reasonably near future in the relinquishment by N.E.E.S. of its shareholdings in operating gas companies.[2]

The proceedings before the D.P.U. are summarized in

---

[1] Collectively, for convenience, the three companies are referred to as the petitioners. The record indicates that Mystic's last rate increase was in 1955, since which time there have been significant rate reductions reflecting Mystic's "business success in promoting the sale of gas . . . enabling service to be offered at decreasing unit prices." North Shore's and Lynn's last rate increases were in 1947 "before the advent of natural gas." There have been rate reductions in the intervening period filed by these companies also.

[2] See *New England Elec. Sys.* 38 S.E.C. 193; *S. C.* 41 S.E.C. 888; *New England Elec. Sys.* v. *Securities & Exch. Commn.* 346 F. 2d 399 (1st Cir.), revd. 384 U. S. 176; *S.C.* 376 F. 2d 107 (1st Cir.), revd. 390 U. S. 207. R. Leigh Fitzgerald, financial vice-president of N.E.E.S. and of each petitioner, testified that there are no plans to object further to the divestment. At the D.P.U. rate hearings it was uncertain precisely how or when N.E.E.S. would relinquish its shares of these petitioners.

Mystic Valley Gas Co. *v.* Department of Public Utilities.

the margin.[3]   As to each of the petitioners, the D.P.U. allowed only a minor portion of the increased rates requested.[4]   The cases, heard together before the D.P.U., were argued together before this court.

## THE ISSUES IN GENERAL.

Each company seeking review raises several substantially similar issues, which in large measure can be discussed together for all three companies.   The action of the D.P.U. concerning Lynn requires some separate discussion (see part 4 of this opinion, *infra*).   The issues as to each company relate (a) to the appropriate capital structure and the cost of certain capital and (b) to the D.P.U.'s failure to adjust test year results to reflect known future increases in the costs of service.[5]   In the first instance, we discuss the

---

[3] The sequence of events was: *December 26, 1968* — Rates filed.  *January 7, 1969* — Rates suspended until December 1, 1969.  *October 16, 22–24, and November 10, 12–13, and 19, 1969* — Public hearings before D.P.U.  *November 24, 1969* — Rebuttal exhibits and testimony.  *November 28, 1969* — D.P.U.'s original * decisions and supplemental order [* *January 28–29, 1970* — Revised D.P.U. *orders*].  *January 23, 1970* — Appeals to county court.  *October 29, 1970* — Reservation and report.  *April 6, 1971* — Arguments in this court.

[4] The revenue increases requested (to become effective February 1, 1969) and those allowed are indicated in the following table.

|  |  | As allowed by amended order of |
| --- | --- | --- |
| Company | As requested in December, 1968 | November 28, 1969 (Note A) |
| Mystic | $1,014,150 | $268,547 |
| North Shore | 324,250 | 167,073 |
| Lynn | 255,400 | 3,410 |

*Note A.*   Alternative findings were made for application in the event of the enactment of certain Federal tax legislation, in fact later enacted.   The findings as modified on January 28 and 29, 1970, resulted in additional revenues (made necessary by 1969 Federal legislation) of $144,994 for Mystic, $46,629 for North Shore, and $37,664 for Lynn.

[5] Each of the petitioners complains that the D.P.U. erroneously (a) disregarded that petitioner's actual capital structure (and cost of long-term indebtedness) and substituted a hypothetical structure;  and (b) attributed to that petitioner the debt and other capital costs of the entire N.E.E.S. system.   Lynn asserts that the D.P.U. improperly assigned to it a higher debt ratio than its own.   The petitioners contend also that the D.P.U. did not make necessary upward adjustments in test year results to allow for known increases in wages and municipal property taxes.   In their brief the petitioners state that for "the purposes of these appeals the . . . [D.P.U.'s] findings as to the proper rate base and the appropriate cost rate for common equity are not contested."

issues as they apply to Mystic (and with substantially equal force to North Shore). We then mention the few significant different aspects of Lynn's situation as compared with that of each of the other two companies.

## GENERAL PRINCIPLES.

1. The petitioners contend that the rates set for each of them are confiscatory. It thus is our duty to afford these utilities "an independent judicial review as to both law and fact." See *Opinion of the Justices,* 328 Mass. 679, 686–690; *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 85; *Wannacomet Water Co.* v. *Department of Pub. Util.* 346 Mass. 453, 457; *Boston Gas Co.* v. *Department of Pub. Util. ante,* 292, 299. See also G. L. c. 30A, § 14 (8) (f); *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716, 717–718. Each petitioner is entitled to "enough revenue not only for operating expenses but also for the capital costs of the business," including "service on the debt and dividends on the stock." The return should be "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." See *Federal Power Commn.* v. *Hope Natural Gas Co.* 320 U. S. 591, 603.

## CAPITAL STRUCTURE AND RATE OF RETURN.

2. Mystic, as of December 31, 1968, the end of the test year, had a capital structure of 61.8% debt and 38.2% common stock.[6] The debt and capital stock outstanding consisted of

---

[6] The comparable structures of the other two petitioners then were:

|            | Debt  | Common Stock |
|------------|-------|--------------|
| North Shore | 60.4% | 39.6% |
| Lynn        | 49.8% | 50.2% |

*First Mortgage Bonds*

| | |
|---|---|
| Ser. A — 3 5/8% due 1974 (issued 1954) | $5,500,000 |
| Ser. B — 6% due 1977 (issued 1957) | 3,500,000 |

*Notes Payable* (unsecured)

| | |
|---|---|
| Due March 31, 1969 @ 6 3/4% (issued 12–26–68 and 12–30–68) | 10,625,000 |

*Capital Stock*

| | |
|---|---|
| 379,385 common shares ($25 par val.) | 9,484,625 [7] |

Mystic has "no plans to issue [additional] mortgage debt in the immediate future." In 1969, Mystic's unsecured debt was expected to remain about $10,000,000 and to carry the "prime rate" of interest plus some additional cost because of lender bank requirements that borrowers carry "compensating balances" on deposit.[8] For a number of years, contrary to "typical" utility practice, Mystic has obtained additional debt financing by short term borrowing at or near the prime rate. Among reasons mentioned for this practice were (a) the pendency of the S.E.C. divestment proceedings (fn. 2, *supra*), which made long-term commitments somewhat undesirable; (b) the advantages of "financing . . . at the prime rate, which . . . was below the [contemporaneous] long-term debt rate . . . through" the 1960's; (c) the disadvantages of "spending an undue amount in the expenses of selling . . . small [bond] issues"; (d) the cir-

[7] Fitzgerald (see fn. 2) called by the petitioners, testified that each of these three petitioners had small minority interests. Many officers and directors of Mystic are also officers and directors of other N.E.E.S. subsidiaries or of N.E.E.S. itself.

[8] In the opinion of Edward H. Ladd, a financial analyst called by Mystic, "Mystic . . . is not a prime credit risk and . . . its ability to borrow funds at the prime rate results from the . . . ownership" of its common equity by N.E.E.S. Fitzgerald (see fn. 2) testified that the financing needs of the system operating companies are determined by New England Power Service Company which also "determines whether financing will be by short or long term debt" and attempts "to maintain a balanced system or . . . consolidated capital structure" which will "fit into an overall financing arrangement for the system as a whole."

cumstance that these companies (at least until their divestment by N.E.E.S.) would be "under the umbrella of a large holding company" with the consequence that the method employed "has been an economical way to finance" while "going through a period of uncertainty" about divestment.[9]

Ladd, called by the petitioners, expressed the view that Mystic should "be evaluated as an independent company that would be viable and financially sound even without" the protection of the parent company, N.E.E.S. He expressed the view that "this . . . would be appropriate even without" the S.E.C. order that N.E.E.S. divest itself of its gas properties. He accordingly used Mystic's existing capital structure in determining what the cost of Mystic's debt capital should be.[10]

David A. Kosh (a public utility consultant called by the D.P.U.) was of opinion "that the appropriate embedded cost of debt for . . . [the N.E.E.S. gas subsidiaries] is the present cost of outstanding debt of the [s]ystem, and not the actual costs of debt of the individual companies." [11] He concluded "it would be unreasonable to

[9] With respect to some of the petitioners, the use of short term borrowings also may have been encouraged by the provisions of G. L. c. 164, § 13 (as amended through St. 1953, c. 85, and as it read prior to the enactment of St. 1967, c. 681). Section 13 limited the issue of a gas company's bonds to "an amount equal to its surplus plus an amount not exceeding its capital stock" plus premiums. There was testimony that in 1959 "three of the gas subsidiaries [of N.E.E.S.] filed applications with the . . . [S.E.C.] for approval of issuance of additional capital stock" which were approved only for two wholly owned subsidiaries, and disapproved for one which had minority common stockholders. It was understood that additional common stock for Mystic would be "similarly opposed by the [S.E.C.] staff." The D.P.U. in fact gave a ruling requested by Mystic, which gave recognition to these factors.

[10] He recognized, however, that the high cost of Mystic's short-term indebtedness (at the times of the 1968 test year and the hearings in 1969) was the product of historically high prime rates during that period. To eliminate "distortion . . . [from] any temporary extreme levels of bank loan rates," he used the average cost of prime rate short-term loans in the years 1965–1969, and adjusted this average upward (from 5.90% to 6.40% to reflect the extent to which, in his opinion, Mystic's ability to borrow on a short-term basis was beneficially affected by its protection by (and assistance from) N.E.E.S.

[11] He referred to the ability of a holding company management "to finance a wide diversity of activities on a system basis," and to exercise "complete control over the financing decisions" and over "the timing and amounts of outside financing so that maximum economy to the system is achieved."

use the actual capital structure of each of these entities to determine the fair rate of return for each." He suggested "two alternative . . . capital structures" viz., (a) "the actual combined capital structure of the gas subsidiaries of N.E.E.S. after reflecting the extent to which the parent has financed their equity . . . by selling debt," or (b) "the actual capital structure of the system consolidated." The latter he computed to be 60% debt, 9% preferred stock, and 31% equity.

The D.P.U. adopted (as the suitable capital structure for Mystic) essentially the second of the alternative solutions suggested by Kosh. In its decision it said, in part, "[T]he issue is not whether the [s]ystem costs are in fact the cost of the subsidiary, nor whether the separate corporate identity of each subsidiary can be ignored . . . . Rather, we . . . decide what would be fair capital structure with which to charge the rate-payers . . . . Thus, recognizing the separate corporate identity of the companies in . . . [N.E.E.S.], they have been financed on a system basis, and . . . little attention has been paid on an individual company basis to the matter of arriving at a 'fair' capital structure." [12] The D.P.U. concluded (a) that it was "reasonable to use as a guide the [s]ystem capitalization which reflects the average situation that the gas companies as a group would enjoy today if they had been financed in part by permanent securities over a representative period"; (b) "that a common equity ratio of forty percent . . . [was] too high for" Mystic, and (c) that "a capitalization of sixty percent debt, nine percent preferred, and thirty-one percent equity . . . [would] be fair for this Company." Accordingly, the D.P.U. fixed as the cost of Mystic's debt a return of 5.2% which was the then

---

[12] The D.P.U. opinion continued, "Moreover, the situation is complicated by the fact that by financing the non-equity portion of the gas companies' capital on a short-term basis . . . the companies are now burdened with high interest rates on substantial portions of their debt. Had these companies been financed in a manner typical of the [s]ystem as a whole, fixed rates securities would have been issued from time to time, and the companies would have had the benefit of the lower interest rates that were available in the past."

"average cost of [s]ystem debt, adjusted to reflect" $20,-000,000 of new system debt to be incurred at current 1968–1969 costs. It took as the cost of Mystic's assumed preferred stock 5.35%, the cost of a relatively recent issue of preferred stock of a constituent N.E.E.S. company, and adopted a return of 10.75% as the proper return upon the 31% common stock equity assumed by the D.P.U. for Mystic. As the composite rate of return on Mystic's rate base, the D.P.U. allowed 7.1%. Mystic does not now object, as already noted (fn. 5), to the rate base adopted by the D.P.U. or to its determination of "the appropriate cost rate for common equity." Mystic, however, does press its contention that the D.P.U., erroneously and without justification, attributed to it a hypothetical capital structure (see fn. 5, *supra*) and, as a consequence, gave it an inadequate return.

The D.P.U. relies in part on statements in two earlier decisions for support of its decision to substitute for Mystic's actual capital structure a hypothetical capital structure based on that of N.E.E.S. as a system. In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 87, 91–92 (the 1951 telephone case), the company desired to reduce its then "top heavy" debt ratio "all at once" to 35%. The department thought "that a reduction to 45% would be safe." The company contended that debt ratio was "a matter for the exclusive determination of the [company's] management." In commenting on this contention, the opinion said (emphasis supplied), "[A] public regulatory board cannot assume the management of the company and . . . interfere in matters of business detail with the judgment of its officers reached in good faith and *within the limits of a reasonable discretion. . . .* But we think that *in this instance, in the circumstances now existing* . . . the debt ratio is not a matter of that kind. . . . Debt ratio substantially affects the manner and cost of obtaining new capital. It seems to us that to say the department could not even consider debt ratio would be to blind its eyes to one of the elements in the problem before it."

In holding (p. 91) that the D.P.U. "could give consideration to this matter" of capital structure and its incidents, it was said (emphasis supplied), "Upon all the evidence, and remembering that the burden of proof is upon the company . . . we are not prepared to say that the refusal of the department to adjust its rates to a reduction in the debt ratio [to 35%] *all at once under particularly adverse conditions* . . . and the department's adoption of the figure of 45% were *in themselves* unlawful or confiscatory."

In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 331 Mass. 604, 618 (the 1954 telephone case) this court had before it a situation changed somewhat from that before it in 1951. The telephone company by then had reduced its debt ratio to 36.1%. The D.P.U. "nevertheless, allowed rates as before upon an assumed debt ratio of 45%" which the company said was "interference with the prerogatives of management." This court again pointed out the significance of capital structure in rate determination, and said (emphasis supplied), "A 35% debt ratio might be deemed in the nature of a *company luxury* not to be reflected in rates to be charged the public. In any event, the . . . [D.P.U.] could think so without our being able to adjudge that there is anything unlawful or confiscatory about its position."

These two telephone decisions, in our opinion, do not permit the D.P.U. to disregard (in fixing rates) existing capital structures of regulated companies unless they so unreasonably and substantially vary from usual practice as to impose an unfair burden on the consumer. The two decisions have recently been reviewed by this court in *Boston Gas Co.* v. *Department of Pub. Util. ante,* 292, 301–302.[13] We concluded in that case (after referring to the

---

[13] There we said, "It would be unreasonable, and an undue interference with reasonable [c]ompany judgment, for the D.P.U. to insist that [the c]ompany's rate of return conform with precision to what the D.P.U. regards as an optimum 60% debt ratio. Within a substantial range this is a matter for [the c]ompany's determination. . . . There is no evidence that (in disregard of fair and prevailing utility practice or of D.P.U. admonitions) [the c]ompany has adopted an unreasonably low debt ratio which may be regarded as a 'company luxury' imposing an undue burden on consumers."

1954 telephone case, 331 Mass. 604, 618–619, and the 1951 telephone case, 327 Mass. 81, 88) that the gas company was entitled to earnings sufficient to meet its actual interest obligations upon existing debt as its structure actually had developed and upon anticipated new debt capital. The evidence did not show that the gas company had gone to any extreme which justified the D.P.U. in disregarding its actual current debt, capital stock, and return requirements. We remanded the case for further consideration by the D.P.U. in the light of our opinion. See *Wannacomet Water Co.* v. *Department of Pub. Util.* 346 Mass. 453, 455–457, where we sustained the D.P.U.'s action, relying upon a management decision in making an investment affecting rate base, although we indicated (p. 457; emphasis supplied) that the D.P.U. "would not have been bound to follow . . . [the management] decision if that decision had been shown to be *plainly unreasonable.*" [14]

With respect to Mystic, the record shows no departure from what is (for Mystic as a separate entity) a reasonable capital structure. We perceive no justification for substituting a hypothetical capital structure for Mystic's actual capital structure of 61.8% debt and 38.2% common equity. Rates are being set for Mystic and not for N.E.E.S. Mystic is a separate corporate entity with minority public stockholders, not a wholly owned subsidiary. [15] See *Public Serv.*

---

[14] The use of a hypothetical capital structure has been adversely criticized, as, for example, by Professor James C. Bonbright, Principles of Public Utility Rates, 243–244. He there refers to the use of a hypothetical structure as substituting "an estimate of what the capital cost *would be* under nonexisting conditions for what it *actually is or will soon be* under prevailing conditions." He recognizes, however, as do we, that "if the existing security structure is clearly unsound or . . . extravagantly conservative, the rule must be modified in the public interest," in which event "[a]ctual cost of capital may . . . be disqualified in favor of *legitimate* cost." See Phillips, Economics of Regulation, 282–283; Garfield and Lovejoy, Public Utility Economics, 128–131. See also *Lynchburg* v. *Chesapeake & Potomac Tel. Co. of Va.* 200 Va. 706, 718–721.

[15] Cases, in which a system capital structure has been applied to *wholly owned* subsidiaries financed entirely by a system holding company, may be distinguishable in some degree. See e.g. *Chesapeake & Potomac Tel. Co. of Baltimore City* v. *Public Serv. Commn.* 201 Md. 170, 189–190; *Re Wisconsin Tel. Co.* 80 P.U.R. (N.S.) 482, 490, 501–505 (Wis. Pub. Serv. Commn.); *Re New York Tel. Co.* 91 P.U.R. (N.S.) 231, 237–240, 258–262 (N.Y. Pub.

*Commn. of Ind.* v. *Indiana Bell Tel. Co.* 235 Ind. 1, 28–30. N.E.E.S. has been ordered to divest itself of its gas subsidiaries. The date and form of that divestment remain uncertain. In the present state of Mystic's affairs and as a practical matter, Mystic is not likely long to be able to rely on N.E.E.S. to provide it with further equity capital or bonded debt or preferred stock capital.[16] Indeed, there is not, and has not been, any legal compulsion on N.E.E.S. to provide Mystic with any capital. See *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716, 722–723; *Wannacomet Water Co.* v. *Department of Pub. Util.* 346 Mass. 453, 468–469.

The evidence (see fn. 12, *supra*) indicates that, in recent years, the cost of short-term debt to a prime-rate borrower usually has been favorable as compared with the cost (to the borrower) of long-term, medium-grade, gas utility bonds. In view of the divestment uncertainties and other factors already mentioned, we think the D.P.U. could not fairly regard as unreasonable Mystic's failure during the last decade to issue long-term debt, at any particular time or even through the whole period. The evidence also does not show that Mystic (in view of the problems of Mystic and

---

Serv. Commn.); *Re Cambridge Elec. Light Co.* 96 P.U.R. (N.S.) 77, 79, 84–85 (Mass. D.P.U. — some preferred stock in hands of public); *Re Lawrence County Water Co.* 48 P.U.R. 3d 448, 452 (Ohio Pub. Util. Commn.). See also *South Carolina Generating Co.* v. *Federal Power Commn.* 261 F. 2d 915, 916, 920–921 (4th Cir.); *Riverton Consol. Water Co.* v. *Pennsylvania Pub. Util. Commn.* 186 Pa. Super. 1, 14–16; Garfield and Lovejoy, Public Utility Economics, 252–254. Cf. *Southern Bell. Tel. & Tel. Co.* v. *Louisiana Pub. Serv. Commn.* 239 La. 175, 199–202; *United Gas Pipe Line Co.* v. *Louisiana Pub. Serv. Commn.* 241 La. 687, 693, 706–711; *Kenton* v. *Public Util. Commn.* 3 Ohio St. 2d 71, 74; *Re Illinois Bell Tel. Co.* 92 P.U.R. (N.S.) 164, 169, 197 (Ill. Commerce Commn.).

[16] Further pertinent considerations are that N.E.E.S. has (a) electric company subsidiaries which are not wholly comparable to its gas subsidiaries, and (b) also a Rhode Island subsidiary, Narragansett Electric Company (see *Narragansett Elec. Co.* v. *Public Util. Admr.* 88 R. I. 56, 66–68). Also increases in long-term bonded debt (see fn. 10, *supra*) would have been difficult prior to St. 1967, c. 681, not effective until January 15, 1968. The record does not show that intercompany transactions between Mystic and N.E.E.S. have been unfairly advantageous to N.E.E.S. or that there have been any harmful actions disregarding the proper separate interests of N.E.E.S. and its subsidiary companies, respectively. Cf. *My Bread Baking Co.* v. *Cumberland Farms, Inc.* 353 Mass. 614, 618–620.

the system) has been engaging in a "company luxury." Indeed, if Mystic had issued long-term bonds during the period of rising and historically high interest rates in recent years, the embedded cost of those bonds would be likely to be a burden to consumers for a long period in the future, when interest rates may have receded.

Little testimony before the D.P.U. concerned whether Mystic now should issue preferred stock or should have done so in the past, except as Kosh recommended attributing to each of the petitioners the N.E.E.S. subsidiaries' consolidated capital structure. It was shown (by an exhibit offered by Mystic) that five other Massachusetts operating gas distribution companies in 1968 had outstanding preferred stock ranging between 6.9% and 20.3% of their respective capitalizations. The D.P.U., however, made no findings about possible preferred stock issues by Mystic other than to say, "There is nothing in the record to suggest that the companies could not have issued preferred stock at prevailing rates applicable at the time of issue." It made no subsidiary finding (a) as to the current 1968 cost to a company like Mystic of issuing preferred stock, or as to the effect of doing so upon its cost of obtaining common stock capital (apart from an ambiguous reference to the historic cost of preferred stock to N.E.E.S.), or (b) of facts showing that it was beyond a proper range of good utility practice for Mystic to fail to issue preferred stock, or (c) that Mystic, in the face of S.E.C. attitudes, could have issued such preferred shares.

We conclude that Mystic, in the circumstances (particularly the divestment uncertainties) affecting the gas subsidiaries of N.E.E.S., is entitled to have its rates computed on the actual cost of its outstanding long-term debt, and the reasonably-to-be expected current cost of its short-term debt and common equity, under substantially its own present capital structure, without hypothetical attribution to it of the existing capital structure and historic capital costs of N.E.E.S. The D.P.U., upon remand of the case to it, is to reconsider, in the light of this opinion, the portions of

its decisions relating to Mystic's appropriate capital structure and cost of capital for rate-making purposes.

3. The situation of North Shore does not vary materially from that of Mystic. The capital structures of the two companies closely resemble each other (see fn. 6, *supra*). The D.P.U. decisions themselves in effect treat both companies (and indeed Lynn also) in substantially similar terms. What we have said above about Mystic we hold to be applicable also to North Shore.

4. Lynn's 1968 capital structure, however, varied somewhat from those of Mystic and North Shore, with approximately (fn. 6) 50% debt capital and 50% common equity capital. The D.P.U. decisions point to this type of variation (more pronounced in the case of certain N.E.E.S. subsidiaries which have not appealed) as ground for not accepting "the proposition that ratios of more or less similar companies, which vary to the degree that these ratios do, are all appropriate for rate making purposes." [17] This statement falls somewhat short of a finding that Lynn's capital structure, viewed by itself, is not reasonable either historically or for rate-making purposes. There are, in any event, no subsidiary findings which show that Lynn's structure is unreasonable for a company of its size and background.

Lynn was formed in 1960 when the gas and electric operations of Lynn Gas and Electric Company were separated with D.P.U. approval. See *Lynn Gas & Elec. Co. and Lynn Gas Co.* D.P.U. No. 13085 (1959). It then had a debt ratio of 30.63%. Since then new construction has been financed exclusively by debt to a point where the debt ratio had increased to 49.76% at the end of 1968. Lynn clearly has been increasing its debt ratio with reasonable diligence. Its short-term debt, according to the financial vice-president

---

[17] The decisions go on to say that the "ratios are not the result of a carefully conceived plan of management to arrive at the best ratio from a cost standpoint, that could be achieved for each company," but "reflect management's reliance on the fact that each separate gas company was part of the larger . . . [N.E.E.S.] system."

of Lynn and N.E.E.S. "has only recently increased to the point where . . . [a small] issue of permanent debt might be warranted." The testimony indicates that the pending divestment proceedings have influenced management policy with respect to Lynn. The D.P.U. found in its 1959 decision (D.P.U. 13085, pp. 6, 7) in effect that "no prejudice [from the separation of the electric and gas businesses was] shown to the [former] company's customers, employees, or security-holders" and (p. 7) that the "separation of the capital accounts . . . [was] fair and reasonable."

In the circumstances, we see no such variance from good practice as would permit the D.P.U. to disregard Lynn's actual capital structure which has developed with D.P.U. acquiescence. See *Boston Gas Co.* v. *Department of Pub. Util. ante,* 292, 301–302. The principles discussed with respect to Mystic apply also to Lynn.

### PROPOSED WAGE AND TAX ADJUSTMENTS TO TEST YEAR RESULTS.

5. The D.P.U., in using 1968 as a test year to measure the petitioners' respective revenue requirements, declined to adjust the test year results to reflect fully (a) wage increases granted by the petitioners, effective April, 1968, and (b) a second group of increases, effective in April, 1969. The operating results of the test year thus gave effect to only nine months of the 1968 wage increase and no part of the 1969 increase. The D.P.U. decisions suggested that "wage increases . . . [have] not over a representative period resulted in an increase per . . . [unit or quantity] of gas sold, and that reductions in employment combined with productivity increases have kept [constant] the relationship between wages and quantity of gas sold."

There was evidence (a) that some wage increases had been granted in every year from 1961 to 1969, and (b) that the increases in April, 1968 (5% + 3 cents an hour, equivalent to 6%) and April, 1969 (5%) had been more pronounced than in 1964 to 1967, inclusive (when increases were only

3.5% or 3.6%). There was also evidence that (a) reductions in employees (1961–1968) were not the "result of [increased] employee productivity" but had been based on "internal changes in how work . . . [was] performed," and (b) there were declining trends in (i) returns (1961–1968) to the petitioners from gas sales (per unit or quantity of gas sold) and (ii) net income as a percentage of operating revenues (1964–1968).

The petitioners thus had basis for contending that the 1968 and 1969 wage increases were sufficiently unusual to require some adjustment of test year results to recognize higher expenses likely to be experienced by the petitioners in the period during which the new rates would be in effect. The evidence left uncertain whether these cost increases were likely to be met by a compensating increase of revenues (see *Central Maine Power Co.* v. *Public Util. Commn.* 153 Maine, 228, 234–238) [18] or whether they demonstrated in some degree attrition or erosion of each petitioner's earning power.

The D.P.U. made only meager subsidiary findings concerning the evidence relied on by the petitioners in this phase of the case. That evidence is not conclusive, although it raises a substantial question whether the test year wage expense was fairly representative of such expense to be expected in the near term future. If no further examination of these cases by the D.P.U. were now necessary, we might well require no further consideration of the effect of these 1968 and 1969 wage increases. These cases, how-

---

[18] Other cases include *Re Wilmington Suburban Water Corp.* 58 Del. 8, 42–43; *Bell Tel. Co. of Nevada* v. *Public Serv. Commn.* 70 Nev. 25, 38–39; *Ex parte Southern Bell Tel. & Tel. Co.* 26 P.U.R. 3d 55, 106–107 (La. Pub. Serv. Commn.); *Re Manufacturers Light & Heat Co.* 26 P.U.R. 3d 463, 475–476 (W. Va. Pub. Serv. Commn.); *Re Arkansas-La. Gas Co.* 40 P.U.R. 3d 209, 226–227 (Ark. Pub. Serv. Commn.); *Re Mountain Fuel Supply Co.* 76 P.U.R. 3d 277, 284–285 (Utah Pub. Serv. Commn.). Cf. *Petition of New England Tel. & Tel. Co.* 120 Vt. 181, 184–185 (actual experience negated adverse effect of wage increase); *Re Inter-County Tel. & Tel. Co.* 33 P.U.R. 3d 287, 290–292 (Fla. R.R. and Pub. Util. Commn.); *Re California Ore. Power Co.* 35 P.U.R. 3d 328, 335–336 (Ore. Pub. Util. Commn.); *Re Chardon Tel. Co.* 40 P.U.R. 3d 129, 135 (Ohio Pub. Util. Commn.); *Re General Tel. Co. of Fla.* 76 P.U.R. 3d 380, 390–391 (Fla. Pub. Serv. Commn.).

ever, must be reconsidered in any event. It thus is possible and suitable now to determine (with adequate subsidiary findings), in the light of actual 1969 and 1970 figures and returns (which have become available), whether the 1968 and 1969 wage increases in fact do fairly require adjustments of test year results or a rate allowance to the petitioners.

6. The D.P.U. adjusted the "test year" figures to reflect established increases as of January 1, 1969, in the rates of local property taxes. It made no adjustment of test year results to reflect the increased taxes on property assessed to the petitioners for the first time as of January 1, 1969. As to this the D.P.U. in its decisions merely said, "[I]t is inappropriate to recognize taxes imposed on additional plant, full effect of the use of which is not felt during the test year." [19]   To the extent that new plant, added in 1968, would give rise to taxes at 1968 tax rates, such taxes would appear to be merely an expected and normal expense arising with respect to new revenue-producing investment. To the extent, however, that the additional plant, first assessed as of January 1, 1969, is taxed at a substantially higher *rate* than that of 1968, consideration should be given to whether the inevitable 1969 tax *rate* increase should not be applied to some extent to new 1968 plant in computing the tax *rate* adjustment of test year results. The D.P.U. in its decision gives no satisfactory reason for not applying the 1969 tax rate to at least the 1968 average plant valuation (used for the rate base) in determining test year local tax expense, instead of making its tax *rate* adjustment by applying the 1969 rate apparently only to the amount of plant actually in being and assessed as of January 1, 1968. The D.P.U. made no adequate subsidiary findings on this phase of the case and its con-

---

[19] In the D.P.U. brief, it is argued (as sole ground for denying any tax adjustment of test year results with respect to new plant not assessed until January 1, 1969), "The increase in municipal taxes due that is the result of additional plant . . . now . . . capable of generating additional revenue to offset that expense is not . . . a distortion" of test year results.

clusions are very vaguely stated. We think that the correctness of the tax rate adjustment of test year results also requires further consideration and findings by the D.P.U.[20]

## CONCLUSION.

7. The cases are remanded to the county court. An order there is to be entered directing (a) further consideration and appropriate modification by the D.P.U., in the light of this opinion, of its several rates, and (b) in each case a further report by the D.P.U. to the county court.

*So ordered.*

---

[20] Whether the new property will in fact generate "additional revenue to offset . . . [the new tax] expense" is probably susceptible of ascertainment from 1969 and 1970 figures and returns presently available. The D.P.U.'s conclusions upon the wage increases and tax *rate* adjustments may be based upon unduly rigid adherence to the figures of 1968 as a test year. There is "merit in testing . . . [those conclusions] against actual operating results of the" petitioners in 1969 and 1970. We assume that this (and other reëxaminations ordered) can be done "without . . . complicated, expensive, and time-consuming new procedures" (see *New England Tel. & Tel. Co.* v. *State,* 104 N. H. 229, 241) although perhaps some further introduction of evidence may be appropriate.