538 So.2d 387 (1989)
STATE of Mississippi, ex rel. Edwin Lloyd PITTMAN, Attorney General
v.
MISSISSIPPI PUBLIC SERVICE COMMISSION and Entex, Inc.
No. 57856.
Supreme Court of Mississippi.
January 4, 1989.
*388 Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Frank Spencer, Asst. Atty. Gen., and W. Glenn Watts, Sp. Asst. Atty. Gen., Jackson, for appellant.
Newt P. Harrison, Brunini, Grantham, Grower & Hewes, Jackson, for appellee.
EN BANC
PRATHER, Justice, for the Court:
The original opinion in this case was handed down April 13, 1988. In due course, Entex, Inc., joined in by the Public Service Commission, filed a petition for rehearing alleging that the Court had erred in remanding the cause to the Public Service Commission for income tax allocation. *389 This Court finds the petition for rehearing well-taken as to this issue. Therefore, the Court withdraws the original opinion, modifies it, and renders the following as the opinion of the Court, affirming the Commission order of September 30, 1986.
This appeal involves a rate increase request of a regulated public utility gas company, Entex, Inc., which owns a non-utility business. The central question addressed is whether the non-utility investment of Entex, Inc. should be included in determining the capital structure of the regulated utility to arrive at its rate of return.
This is an appeal by the State of Mississippi acting by and through the Attorney General (hereinafter AG) from an order of the Mississippi Public Service Commission (hereinafter PSC) awarding Entex, Inc. an increase in its residential and small commercial rates of $2,450,163 annually. The AG assigns the following as error:
(1) The PSC erred by not requiring a utility company seeking a rate increase to properly meet its burden of proof of establishing by substantial evidence that its proposed capital structure would result in just and reasonable rates.
(2) The PSC erred in not requiring the company to reflect in its revenue requirement the company's share of income tax savings which developed for the consolidated corporation as the result of a subsidiary non-regulated business's operating losses.

I.
Entex Inc. is a regulated public utility selling natural gas to approximately 108,000 Mississippi customers in sixtyeight municipalities in thirty-five counties, living primarily in south, central and northwest Mississippi, the vast majority of whom are residential customers.
In addition to its utility regulated business, Entex has diversified, non-regulated business activities including a savings & loan operation, the manufacture of security equipment and automobile products, and contract drilling. Inclusion of the investment of its savings & loan association, University Savings Association, in the capital structure of Entex is at the heart of this appeal. Entex owns all outstanding stock of University Savings Association, which operates exclusively in Texas. Entex has admitted to the non-utility, highly competitive, geographically restricted nature of University's operations.
On June 3, 1986 Entex filed a Notice of Intent to Change Rates with the Public Service Commission, requesting a rate increase of $3,750,186, its first request in almost four years. The requested adjustment would have increased residential rates by 9.47 percent, small commercial rates by 3.11 percent, and thus overall sales revenue by 4.82 percent. The proposed increase would have amounted to $2.89 per customer per month.
Entex originally contended that it should be allowed an opportunity to earn a 16 percent return on the equity portion of its rate base, a 10.88 percent return on the debt portion, and thus an overall 13.78 percent return, based on Entex's actual capital structure of 43.41 percent debt and 56.59 percent equity.
Entex's filing was based on the actual operating results for the twelve months ending December 31, 1985 as the historic period for stating operating expenses and revenues. These historic period figures were normalized and projected to levels expected for the twelve-month period beginning October 1, 1986 and ending September 30, 1987. As shown by Entex's company wide balance sheet, the company's total capitalization as of December 31, 1985 was $515,136,864, consisting of $291,536,347 in stockholders' equity and $223,600,517 in long term debt. On July 8, 1986, the Attorney General intervened on behalf of the rate payers in Entex's service area and state taxpayers who must support increased costs of gas to the state's boards and agencies.
At the trial of this rate increase request, the PSC heard expert testimony from three rate experts.
Entex's rate expert, Dr. David Eisinger, testified that Entex's actual capital structure as of December 31, 1985, should be used in determining Entex's overall rate of *390 return on its Mississippi rate base because the company's actual capital structure was in line with that of comparable natural gas companies having risks similar to Entex. However, he removed from consideration such companies as Bay State, Diversified Energies, Southwest Gas and W.I.C.O.R. from his sample because their diversified business activities or other occurrences would distort the results of the model.
Dr. Wendell Deer, the PSC staff's rate of return expert, also recommended the use of Entex's actual capital structure. When asked what capital structure should be used to set the weighted cost of capital for Entex, he answered, as follows:
The capital structure proposed by Entex is for the total company operation. In their last rate case in 1982, they used the Mississippi Division Capital Structure where the additions to the rate base coupled with the retirement of debt had caused the equity percentage to increase to 62.38%. If the same procedure is followed in this case the equity percentage would be around 80%. Sometime in 1989 the equity would increase to 100%. Therefore, I recommend that we use the capital structure as proposed by the company.
By virtue of its exclusive Texas orientation, University Saving Association (University) serves in no way to benefit the ratepayers of Mississippi. Thus, the third expert witness, Thomas H. Weiss, the AG's expert witness, assigning the Entex investment in University entirely to common equity, excluded from Entex's equity the entire $131,089,000 of investment in University in developing its rate of return since these funds were not devoted to public use and the subsidiary has nothing to do with the Mississippi utility operations of Entex. The adjustment would yield a capital structure of 58.47% long term debt and 41.53% common equity. Weiss testified that, if accepted, the capitalization ratios agreed upon by Entex and the commission staff would result in rates for gas service that include an income component which requires Entex's customers to subsidize the Entex stockholders' interest in certain non-utility operations.
Due to the depressed real estate markets in Texas, University was predicted by Value Line Investment Survey Sheets to lose sixty-two million dollars in fiscal year 1986, according to Weiss. The PSC made no mention of the projected loss in its order.
Weiss claimed that the range of equity ratios exhibited by Moody's Gas Distribution Utilities as of December, 1985 was from a low of 38.2% to a high of 66% and that his recommended 41.78% equity ratio falls within that range. Based on his adjustments to Entex's capital structure, and a return of 13.50% on equity and 10.88% on debt, Weiss recommended an overall return of 11.97%. In developing their recommendation as to the proper rate of return, the three experts used the same eleven comparable natural gas companies, with one exception, as developed in Eisinger's rebuttal testimony below.
Weiss explained the role and impact of capital structure on the revenue requirement of a regulated utility. He further explained that the investment in University must be removed from the common equity component of the Entex consolidated capital structure in order to adjust that structure to purge it of the risks associated with University's operations, and that the adjusted capital structure applies only to the risks associated with the energy related lines of the Entex business portfolio. Because University's operations in no way benefit Entex Weiss also explained that his proposed adjustment was necessary to insure that the significant risks of University's operations were not reflected in Entex's Mississippi jurisdictional revenue requirement.
After the two prehearing conferences, Entex and the PSC staff entered into a stipulation on all of the contested issues. Entex accepted the adjustments which the PSC staff recommended and a number of adjustments suggested by Weiss. Entex agreed to accept an increase of $2,450,163 rather than $3,750,186 as originally requested.
On August 22, 1986, the AG filed a "Partial Joinder" in the stipulation. The AG's *391 primary objection, the sole basis for this appeal, pertained to Stipulation No. III, which provides as follows:
The staff and Entex agree that the proper capital structure for Entex, Inc. in this proceeding should be the capital structure of the company as shown by Exhibit "WBS-5" to the prefiled testimony of Wayne D. Stinnett. That capital structure consists of 43.41% long term debt and 56.59% equity and is adopted as the capital structure of the company in this proceeding.
The AG objected to this stipulation, contending that Entex's overall rate of return should have been determined on the basis of the adjusted capital structure of 58.22% long term debt and 41.78% equity, as recommended by Weiss.
Eisinger testified extensively in rebuttal. Part of this testimony follows:
In fact, it would be accurate to say that the capital structure used by Entex in this case is "typical" for the industry and is in line with what a commission would use if it were going to adopt a hypothetical debt-equity ratio. It follows, therefore, if the Commission adopts Mr. Weiss' position, it must reject an actual debt-equity ratio which is more representative of the industry than the hypothetical structure which Mr. Weiss urges this Commission to adopt.
... .
... What Mr. Weiss fails to point out, however, is that only one of the Moody gas distribution companies (NICOR) has a common equity ratio as low as he is recommending for Entex in this case and not a single one of those companies has a long term debt ratio as high as he is recommending for Entex in this case! Exhibit DWE-2 attached to this testimony shows the 1985 Long Term Debt ratios of Moody's natural Gas Distributors and, as you can see Mr. Weiss' recommended debt is almost 20% higher than the next closest company. He also fails to point out two very significant factors concerning NICOR. Those factors are: (1) During 1985, NICOR embarked on a substantial corporate restructuring which caused management to write down common equity by about $214 million, or 36% of its common equity and (2) Value Line projects that, by 1989-91, NICOR's equity ratio will again be 51.5%. Thus, the 1985 year-end capitalization for NICOR does not represent an appropriate long-term capital structure for the company.
Excluding NICOR, Mr. Weiss's recommended 41.78% equity ratio is well below the next lowest equity ratio  Atlanta Gas Light's 45.5%. Focusing solely on the natural gas companies I used as comparable companies, Mr. Weiss's recommendation again is lowest, as shown in Exhibit DWE-3. It should be noted that Mr. Weiss has based, in part, his equity return recommendation on these same comparable companies.
Thus, Mr. Weiss's arbitrary adjustment gives an unrealistic hypothetical capital structure that is inappropriate for a natural gas distribution utility and results in a common equity ratio that is below the range established by examination of a group of comparable companies.
... .
Q. Can you provide any evidence that would show that Entex's investment in University Savings was debt-financed?
A. Attached as Exhibit DWE-4 are copies of "Management's Discussion and Analysis of the Summary of Operations" from Entex's 1978 and 1980 Annual Reports. In its comparison of 1978 results with 1977 on page 23 of Entex's 1978 Annual Report, management says:
"... The increase in interest is primarily a result of the debt incurred related to acquisition of drilling rigs and the additional investment in University Savings." (Emphasis added)
And on page 29 of the 1980 Annual Report, comparing 1979 with 1978, management says,
"... The increase in interest expense is a result of debt incurred to finance the acquisition of Allied and Center [Savings Association], a $25 million term *392 bank loan, increased short term bank borrowings and higher interest rates." [Emphasis added]
Thus, Entex's management clearly indicates to its shareholders and the financial community through its annual reports, that at least a portion of Entex's investment in University Savings, at least in part, was debt-financed.
... .
Q. If a hypothetical capital structure is not created in this case by removing the savings and loan association, how can the Commission be sure the Mississippi rate payer is not being required to subsidize that operation?
A. By making sure that the company has a capital structure that is fair to the rate payer and that the return it grants on the equity portion of that capital structure is in line with equity returns on investments in other enterprises having corresponding risk, the Commission ensures that Mississippi ratepayers are not subsidizing the savings and loan or any other Entex operation.
In this case, the capital structure which Entex is using consists of 43.41% long term debt and 56.59% equity. As I pointed out earlier, such a capital structure is not only fair and reasonable to the rate payer, it is very close to a "typical" capital structure which one would expect to find generally when looking at natural gas distribution companies in today's environment. Moreover, it is in line with what a commission would use if it were going to impose a hypothetical capital structure on a natural gas distribution company today. If Entex's December 31, 1985 capital structure is reasonable and fair (and no one, not even Mr. Weiss, has said that it is not) then the Commission should use it. If the capital structure happens to include non-utility subsidiaries, so be it. So long as the overall capital structure is fair to the rate payer and is in line with what one would expect to find in a natural gas distribution company, it does not make any difference whatsoever if non-utility subsidiaries are included. On the other hand, if the capital structure is not fair to the rate payer, then the Commission should use a hypothetical capital structure regardless of whether the company owns non-utility subsidiaries. For example, assume that Entex, Inc.'s sole and only business was its Mississippi distribution company. Assume further that the actual capital structure was 100% equity and 0% debt. Under today's circumstances, the Commission would be justified in finding that such a capital structure is unfair to the rate payer and, therefore, under existing Mississippi law would have the right to adopt a hypothetical capital structure which would be less burdensome to the customers. This is true even though in my hypothetical situation, Entex's only property is the Mississippi gas distribution system. But where the actual capital structure is reasonable and fair, as in this case, it makes no sense to use a hypothetical capital structure. So, the first step is to make sure the capital structure is fair. The second step is to make sure that the return to the equity owner is commensurate with returns on investments in other enterprises having corresponding risk... .
... .
A decrease in the common equity ratio, especially of the magnitude proposed by Mr. Weiss, would substantially increase the firm's financial risk. A higher return on common equity would be necessary to compensate investors for this higher risk and consequently the Commission should increase the firm's allowed return on common equity. Mr. Weiss's recommendation of both a common equity ratio that is substantially below the average ratio of both Moody's gas distribution companies and the companies used to establish his DCF return and his recommendation of a low equity return are fundamentally inconsistent with financial theory.
Additionally, lowering the equity ratio without a commensurate increase in the allowed return on common equity would lower the firm's pretax interest coverage *393 and possibly could jeopardize the firm's financial integrity. Ultimately, this could cause a lowering of the firm's bond ratings with the attendant higher financing costs.
Eisinger used the following companies:

 Common Equity
 Company Ratio 
 Energen 68.5%
 Laclede Gas 66.0
 Primark 57.4
 National Fuel Gas 56.8
 Indiana Energy 55.0
 Peoples Energy 53.9
 Washington Gas Light 51.3
 Northwest Natural Gas 49.0
 NUI Corp. 48.1
 Piedmont Natural Gas 45.7
 Atlanta Gas Light 45.5
 Weiss Recommendation 41.78
 Source: Value Line Investment Survey

In his rebuttal testimony, Weiss developed the point that "should University be sold at, above or below book value, there is no effect on the amount of debt for which Entex, Inc. is responsible  both the gains and losses of University ... accrue only to the Entex shareholders!!" (Emphasis added).
On September 30, 1986, the PSC entered its order. Entex was awarded an increase in its residential and small commercial rates of $2,450,163. In the portion of its order dealing with the capital structure issue, the PSC reviewed the various expert opinions and found that the actual capital structure of 43.41% long term debt and 56.59% equity should be adopted, as stipulated by the staff and Entex, and that this structure is typical for the industry. The PSC stated that it knew of no case where it adopted a hypothetical capital structure in the absence of a showing that the actual capital structure was imprudent, uneconomical or unfair.
On October 30, 1986, the AG's staff filed an application for rehearing. The issue of improper capital structure was once again brought to the PSC's attention. In an effort to determine if the purchase of University involved any debt, as Entex claimed, Weiss found some twenty-one million dollars of short term debt which could possibly be involved, revised his equity adjustment accordingly, and concluded that the minimum known and measurable investment in University was $110,497,000. Consequently, the AG asserted that this capitalization should be removed from Entex's common equity to purge it of the additional return ratepayers would be required to support in cost of service of capital, thereby preventing the ratepayers from having to pay more for gas services than those services were reasonably worth.
After the PSC failed to respond to the application for rehearing, the AG filed a notice of appeal on November 26, 1986.

II.

DID THE PSC ERR BY NOT REQUIRING ENTEX, A UTILITY COMPANY SEEKING A RATE INCREASE, TO PROPERLY MEET ITS BURDEN OF PROOF OF ESTABLISHING BY SUBSTANTIAL EVIDENCE THAT ITS PROPOSED CAPITAL STRUCTURE WOULD RESULT IN JUST AND REASONABLE RATES?

A. The Law
The importance of determining the proper capital structure is illustrated as follows. The PSC determined that Entex should be given an opportunity to earn a 13.75% return on equity and a 10.88% return on debt, as recommended by Deer. The Commission further determined that the proper rate base for the company in this case was $20,041,306. If Entex's rate of return is determined using Entex's actual debt-equity ratio, then the company's overall rate of return is 12.5% computed as follows:

 % of Capital Return Weighted
 Structure Allowed Average Cost
Equity 56.59% x 13.75% = 7.78%
Debt 43.41% x 10.88% = 4.72%
 Overall Rate of Return 12.50%

Multiplying the overall rate of return of 12.5% times the rate base of $20,041,306.00 produces a net operating income requirement of $2,505,163.00.[1]
*394 If, on the other hand, the rate of return is determined using Mr. Weiss's hypothetical debt-equity ratio, then the overall rate of return will be only 12.07%, computed as follows:

 % of Capital Return Weighted
 Structure Allowed Average Cost
Equity 41.53% x 13.75% = 5.71%
Debt 58.47% x 10.88% = 6.36%
 ______
 Overall Rate of Return 12.07%

A. 12.07% rate of return on a rate base of $20,041,306.00 produces a required net operating income of only $2,418,986.00. Note that the rate base is limited to Mississippi operations of Entex whatever the capital structure may be.
The PSC is an arm of the Legislature. While the Utility has the burden of proving by substantial evidence that it clearly is entitled to the requested increase, the order of the regulatory body, the PSC, presumptively is considered valid. Due to its expertise, the PSC is the trier of facts and within this province it has the right to determine the weight of the evidence, the reliability of estimates and the credibility of the witnesses, and it is free to accept or reject the recommendations of any of the witnesses. The reasonableness of public utility rates is not determined by definite rules and legal formulas, but is a fact question requiring the exercise of sound discretion and independent judgment in each case. Mississippi Public Service Commission v. South Central Bell Telephone, 464 So.2d 1133, 1134-35 (Miss. 1984).
Miss. Code Ann. § 77-3-72(4) (Supp. 1987) governs in this case and provides as follows:
The order shall not be vacated or set aside either in whole or in part, except for areas of law, unless the court finds that the order of the Commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the Commission, or violates constitutional rights.
The rate making function is legislative in character and not the function of a court, which is without power to fix rates charged by a public utility. 464 So.2d at 1135.
This Court has stated that the burden of proof on the utility includes substantial evidence that the formula adopted for use in calculating rates is reasonable and best suited for such determination. State ex rel Allain v. Miss. Pub. Serv. Com'n, 435 So.2d 608, 615 (Miss. 1983). See Miss. Pub. Serv. Com'n v. Coast Waterworks, 437 So.2d 448, 451 (Miss. 1983).
Where the only major conflict in evidence is the difference in opinion of the rate experts, and the PSC follows none of the experts and makes no sufficient finding of fact to support its ultimate conclusion, then the PSC's order is not supported by substantial evidence and is against the manifest weight of the undisputed evidence. Miss. Pub. Serv. Com'n v. Mississippi Power & Light Co., 336 So.2d 769, 774 (Miss. 1976). However, so long as the PSC examined and considered the evidence and testimony of each expert witness, the Commission was within its statutory authority in accepting or rejecting all or any portion of any expert's opinion. This Court does not determine which expert's view it would have accepted. The PSC must not ignore salient and substantial factors offered into evidence, but it is the trier of fact and is free to accept or reject recommendations of any of the witnesses. State ex rel. Pittman v. Miss. Pub. Serv., 481 So.2d 302, 305 (Miss. 1985).

B. Analysis
The only Mississippi case which directly involved the adoption of a hypothetical capital structure is Southern Bell Telephone & Telegraph Co. v. Miss. Pub. Serv. Com'n, 237 Miss. 157, 113 So.2d 622 (1959). After defining a fair return as "one which, *395 under prudent and economical management, is just and reasonable to both the public and the utility," 113 So.2d at 656, see State ex rel. Pittman v. Miss. Pub. Serv., 506 So.2d 978, 984 (Miss. 1987), this Court stated the following:
The Commission, having found that the capital structure of the company was imprudent and uneconomical, and unfair to telephone subscribers because of its low debt ratio, had a right to adopt a hypothetical capital structure which would be less burdensome to the telephone subscribers for use in the determination of the earnings requirements of the company.
113 So.2d at 656. As is evident, this Court did not require the adoption of the hypothetical capital structure and gave great weight to the Commission's finding that the actual capital structure was imprudent and uneconomical and unfair because of its low debt ratio. This Court concluded that the PSC's disapproval of the company's imprudent debt ratio and adoption of a hypothetical debt ratio was neither arbitrary, nor unreasonable. Id.
It is this Court's opinion that Mississippi law requires affirmance of the PSC's use of Entex's actual capital structure. In support of this conclusion, this Court looks to the following factors, in an order bearing no relationship to any one variables weight:
(1) The testimony of Dr. David Eisenger and Dr. Wendell Deer;
(2) The fact that Entex's actual capital structure falls well within the median range of comparable companies;
(3) The difference between the actual ratio and Entex's hypothetical ratio has been markedly narrowed; and
(4) All cases support this conclusion.
The testimony of Dr. David Eisinger, as well as that of Dr. Wendell Deer, provides a substantial basis for the determination of the PSC not to exclude from Entex's capital structure its investment in University Savings. The testimony has been previously discussed.
Entex's actual capital structure is actually somewhat closer to the median capital structure of comparable natural gas companies than is Weiss's adjusted capital structure. Further, the actual capital structure is far closer to the median than is the capital structure of the Mississippi operations of Entex, which had been used in the previous rate case, was about 80% equity at the time of this rate case and was expected to become 100% equity sometime in 1989, according to Deer.
The AG's petition for rehearing reflects that Weiss revised his equity adjustment after finding $21 million short term debt possibly involved in the purchase of University Savings. The AG admitted on oral argument that this adjustment increased the equity ratio to about 44%. Thus, the difference between the actual structure and Weiss's adjusted structure has been narrowed to no more than 13%. Therefore, the argument that the actual capital structure is imprudent and unfair is weakened accordingly. See New England T. & T. Co. v. Department of Pub. Util., 360 Mass. 443, 275 N.E.2d 493, 509 (1971).
"Equity thickening" was common among utility companies a few decades ago and has recently reappeared. "The term refers to an increase in the proportion of equity in a utilities capital structure, often caused by an influx of cash and the retirement of debt to decrease overall financial risk." "Equity Thickening"  How Will Regulators Respond?, Pub. Util. Fort., Sept. 5, 1985, at 54. The author of this article asserts that even if equity thickening is temporary, public utility regulators have a unique opportunity to put utilities in strong financial position for the next round of necessary construction and to allow utilities to lower financial risks, thereby making recent increases in business risks reasonable and safe. Id. at 56. In the past, hypothetical capital structures have been imposed to offset the higher rates of return produced by high equity ratios. Id. Although there is disagreement, there is widespread support for the view that the actual or planned capital structure should be used in computing the cost of capital in normal circumstances. C. Phillips, The *396 Regulation of Public Utilities, 349 (1984). Where a utility is a wholly owned subsidiary which obtains its equity capital through its parent corporation, a set of circumstances which is the converse of the situation in the instant case, commissions commonly use the capital structure of the consolidated system. Id. at 352.
Phillips quotes Bonbright's criticism of hypothetical or "typical" capitalization that such capitalization "`substitutes an estimate of what the capital cost would be under non-existing conditions for what it actually is or will soon be under prevailing conditions.'" Id. at 349. Indeed, state and federal commissions have been increasingly reluctant to impose hypothetical capital structures, finding the practice overly subjective. "Equity thickening," supra, at 55.
For example, current federal cases must be seen in light of the established Federal Energy Regulatory Commission (FERC) policy of using actual capital structures rather than hypothetical capital structures for purposes of developing the rate of return for regulated pipelines. Public Service Com'n of State of New York v. F.E.R.C., 813 F.2d 448, 459 (D.C. Cir.1987). There, because Tenneco is a conglomerate with numerous non-pipeline subsidiaries and divisions, any attempt to exclude stock attributable to businesses engaged in unrelated activities would necessarily result in the adoption of a hypothetical structure, and thus the FERC policy applied to preclude such adoption. Id. at 462. Similarly, the AG's assertion that Weiss's adjustments do not yield a hypothetical capital structure is refuted.
Another problem with an hypothetical capital structure is that such structure should not be adopted in the absence of an appropriate adjustment to the rate of return on the equity capital.
Aside from individual luck or unusual business clairvoyance, debt capital does not cheapen the over-all productive process. The total risk is the same and so the justifiable and required return is the same. The only difference is that of shifting more of the risk onto the ownership interest and less on the debt interest... . [E]very unit of debt capital throws an added burden on the equity capital.
Joslin & Miller, Public Utility Rate Regulation, 43 Va.L.Rev. 1027, 1059-60 (1957).
Unless the rate of return to equity capital is adjusted upward, and it seldom is, the utility is forced to adopt the hypothetical debt ratio to earn its allowed rate. But if the hypothetical debt ratio is significantly higher than the actual debt ratio, it may take several years of financing exclusively by means of debt to attain the higher ratio. During this period, the utility is unable to realize the rate on equity found to be required... .
Phillips, supra, at 349. An adjustment to the rate of return on common equity should be made "to reflect the greater inherent risk in a stock with low equity ratio than that in a stock with higher equity ratio." Hyde, Rate of Return  An Art or a Science?, Pub. Util. Fort., Dec. 18, 1975, at 27. In Public Service Com'n of State of New York v. F.E.R.C., supra, the D.C. Circuit distinguished a Fifth Circuit case, El Paso Natural Gas Co. v. FPC, 449 F.2d 1245 (5th Cir.1971). The El Paso Court noted that the Commission expressly considered the thinning effect which the elimination of the stock used to acquire the unrelated companies had upon the company's common equity and accordingly permitted El Paso to recover the highest rate of return allowed by the Commission in recent years. Id. at 1251. In Public Service Com'n of State of New York v. F.E.R.C., the FERC did not make any such adjustment to the rate of return. 813 F.2d at 462, n. 21. Likewise, in the instant case, since the PSC did not exclude the stock attributable to the savings association, it had no need of increasing the rate of return due to the thinning effect on common equity. These considerations were reflected in the testimony of Eisinger.
One writer has asserted that there is a strong case to be made for higher common equity ratios for natural gas companies due to increased business risks and increased embedded debt costs:

*397 On the business risk side, natural gas companies are facing sharply increased degrees of competition at both the pipeline and distribution levels. Increased competition means increased business risks, which dictates higher equity ratios.
At the same time, increased embedded debt costs, with higher foreseeable increased debt costs, mean a potential for reduced coverage ratios and, ultimately, a higher cost of capital. Deteriorating coverages dictate higher equity ratios, especially in the face of declining allowed rates of return on equity... .
Copan, The Case For Higher Common Equity Ratios For Natural Gas Companies, Pub. Util. Fort., July 11, 1985, at 24, 29. Indeed, the D.C. Circuit noted that diversification could reasonably be presumed to benefit rate payers by reducing operating and financial risks. 813 F.2d at 462. Even so, the Fifth Circuit has refused to give substantial weight to the returns earned by integrated natural gas companies to assure that the risk associated with activities other than transmission and distribution of natural gas would not distort determination of the proper rate. Ark. La. Gas Co. v. F.E.R.C., 654 F.2d 435, 438 (5th Cir.1981). In the instant case, the experts did remove integrated natural gas companies from their lists of comparable companies.
With regard to Copan's discussion of increased embedded debt costs, note that Eisinger testified that a lower equity ratio without commensurate increase in the rate of return on common equity would lower Entex's pretax interest coverage, which could lower the firm's bond rating with the attendant higher financing costs. As foreseen in 1957, this problem could be aggravated by economic changes:
For many years now, the general economic development has been such, that the regulatory arm has been able to show that savings are made by increasing the debt ratio. However, in an economy shift where the fixed cost of the demanded debt capital becomes extremely high in relation to the current return on like capital generally, then these savings are lost unless the high fixed cost of debt capital is paid from a reduction in return on equity capital. This would be the tempting means to forestall consumer concern at that juncture.
Joslin & Miller, supra, at 1060. Besides, on oral argument, Entex admitted that affirmance by this Court of the PSC's use of Entex's actual capital structure would not preclude a later PSC determination that Entex's debt cost was too high and thus not fully allowable, due to a risky investment resulting in substantial losses.
The reasons that a public service commission should be wary of imposing a hypothetical capital structure were ably summarized by a leading authority as follows:
In the case of growth-prone and capital-intensive utilities, it is more important in the interest of consumers to protect the ability of the enterprise to raise capital at all times than it is to minimize the short-term cost of capital. This objective requires that a public utility make every effort to keep indebtedness at a prudent and conservative level.
... .
Needed flexibility  the ability of a corporation to make appropriate financial decisions over the long term  is afforded by keeping the debt ratio below the upper limit of the range of reasonableness to the extent possible when conditions are favorable.
As a matter of finance theory, every firm has an optimum capital structure at which the cost of total capital is minimized, either on a pretax or on an after-tax basis. That optimum capital structure, however, changes over time and cannot be given reliable quantitative measurement at any given time. Probably most analysts would agree that the cost of total capital does not vary significantly over a considerable range of differences in capital structure. The reason is that the cost of each component  debt, preferred, and common equity  is dependent on the capital structure.
Financial policy should minimize the income tax burden, but only within the limits of an otherwise prudent capital *398 structure. Minimization of short-run costs may yield long-term disadvantages to consumers, and this is not a desirable objective. Moreover, the national tax structure is continuously subject to revision... .
This caution was suggested by Professor Bonbright: "Lower ratios may well be worth their higher costs by reducing the risks of financial adversities which would have a serious impact on the quality and expansion of the supply of public service." Principles of Public Utility Rates 44 (1961). As the New York Commission said, a regulatory responsibility is to assure for the utility a sound financial standing so that it can attract on reasonable terms capital needed for expansion. "A slightly lower return now might well result in sharply higher financial costs in the future and would be self-defeating in the long run." Re Orange and Rockland Utilities, 92 P.U.R. 3d 479, 490 (New York Public Serv. Comm'n 1971).
Foster, Fair Rate Criteria and Estimation, 28 Baylor L.Rev. 883, 891-92 (1976). Joslin and Miller add the following reasons for not considering hypothetical tax savings:
It seems then that the hypothetical tax savings made on hypothetical debt ratio should not be considered by the regulatory arm, both because of freedom of the owner interests to decide their capital status, and because there is little or no actual benefit to the consumer, but only a fertile area for demagoguery.
Joslin & Miller, supra, at 1061-62.
Finally, particularly in light of the foregoing discussion, the PSC may well wish to avoid imposing a hypothetical capital structure in this case as an unwarranted interference with the function of ownership and risk:
It seems, then, that it is economically sound to leave with management the decision as to proper debt ratio, at least within that area where the directors are not usurping or defaulting on their duties as directors. This would then leave them with the responsibilities to the ownership interest which will take the advantages and losses resulting from misjudgments in constructing the enterprise's capital structure... .
Joslin and Miller, supra, at 1060. Contra Rose, "Cost of Capital" in Public Utility Rate Regulation, 43 Va.L.Rev. 1079, 1088-89 (1957).
A considerable responsibility is taken by regulatory authorities, which require an enterprise to incur a heavier load of debt than the management of the enterprise believes to be proper. Financial policies are subject to continuing review by both management and regulatory authority in light of changes actually experienced and future probabilities. However, regulatory authority should not substitute its judgment unless it concludes, after full analysis, that decisions being made by management are clearly imprudent. It always has been a guiding principle of rate regulation that costs should be allowed unless managerial decisions are found to have been imprudent when evaluated in the light of the circumstances existing at the time the decisions were made, without the benefit of hindsight.
Foster, supra, at 892.
Nothing in this opinion should be construed to prohibit absolutely the imposition of hypothetical capital structures by the PSC. Instead, the foregoing discussion makes it clear that the expert opinions of Drs. Eisinger and Deer constitute substantial evidence in support of the PSC's use of Entex's actual capital structure.
This Court has found only a few state courts which have addressed the precise issue at hand. None of those states have specifically held as the AG urges here, although there is some language favorable to the position of the AG. The Vermont Supreme Court stated that non-utility costs are excluded from the costs of capital in rate proceedings because they are not a regulated activity over which the Board has control. However, the Court did not permit exclusion of the cost of capital of a power plant from the company's total embedded *399 cost of capital because it was not shown the plant was not used for the benefit of the ratepayer, and provision had not been made for a return on the cost of the security issues from another source. Petition of Green Mountain Power Corporation, 131 Vt. 284, 305 A.2d 571, 579 (1973).
The Supreme Judicial Court of Massachusetts stated that the Department of Public Utilities is not permitted to disregard existing capital structures of regulated companies unless they so unreasonably and substantially vary from usual practice as to impose an unfair burden on the consumer. However, the Court placed great weight on the fact that the gas company was a partially owned subsidiary whose parent had been ordered to divest itself of the company. Mystic Valley Gas Co. v. Department of Public Util., 359 Mass. 420, 269 N.E.2d 233, 239-40 (1971). Such is not the case here. The Court noted that cases in which a system capital structure has been applied to wholly owned subsidiaries financed entirely by a system holding company may be distinguishable in some degree. Id. 269 N.E.2d at 239, n. 15.
A few public utilities commissions or public service commissions have addressed the issue at hand, but, as stated, these commissions are triers of fact, and their statements are not made in the context of limited appellate review. See, e.g., Re: Carrabassett Light & P. Co., 17 P.U.R.4th 246, 248 (Maine P.U.C. 1976); Re: Niagara Mohawk Power Corp., 83 P.U.R.4th 97, 172-3 (N.Y.P.S.C. 1987); Re: Intermountain Gas Co., 86 P.U.R.3rd 438, 442-4 (Idaho P.U.C. 1970); Re: Gas Company of New Mexico, 28 P.U.R.4th 20, 37-38 (N.M.P.S.C. 1978).

C. Holding
This Court holds that the PSC order of September 30, 1986 holding that the proper capital structure in this case was Entex's actual capital structure as of December 31, 1985, was supported by the testimony and legal authority of this state and was proper as reasonable and fair to the Mississippi ratepayers. Holding that Entex met its burden of proof by substantial evidence that just and reasonable rates are granted, this Court rejects this assignment of error.

III.

HAVING ALLOWED THE COMPANY TO DEVELOP ITS REVENUE REQUIREMENT USING THE COST OF CAPITAL INCLUDING THE RISKS OF UNIVERSITY'S OPERATIONS, DID THE COMMISSION ERR IN NOT REQUIRING THE COMPANY TO REFLECT IN ITS REVENUE REQUIREMENT THE COMPANY'S SHARE OF INCOME TAX SAVINGS WHICH DEVELOPED FOR THE CONSOLIDATED ENTITY AS THE RESULT OF UNIVERSITY'S OPERATING LOSSES?
As stated, Entex has non-regulated business activities in addition to its regulated utility. One such non-regulated business was University Savings and Loan Association (University) which was projected to have a loss of approximately sixty-two million dollars. Because of the University loss, Entex's income tax liability would be reduced considerably by the filing of a consolidated income tax return by the parent corporation.
Entex calculated the income tax component of its claimed revenue deficiency as though the Mississippi operations "stand alone," as the term is used in regulatory agencies. Thus, included in Entex's projected revenue deficiency of some $3,747,153 for the test year ending September 30, 1987 was $1,786,836 of revenues to cover federal and state income taxes. PSC Staff witness Leon Brownings included $1,479,617 income tax expenses in the $73,288,655 of operating expenses accepted by the PSC in its final order.
Weiss noted that Entex files a consolidated federal income tax return for its diversified businesses, yet allegedly calculates its tax liability for rate-making purposes as though the Mississippi operations stand alone. Although University was projected to lose sixty-two million dollars in 1986, income tax savings will accrue only to the Entex shareholders, while if University becomes profitable, only the shareholders reap the benefits. Thus, Weiss stated that *400 it was only logical to reflect the investment in University as equity and to remove it from the capital structure used to calculate Entex's revenue requirement.
The application for rehearing asserted the inconsistency of the ratepayers being asked to pay for the alleged increased risk of University as reflected in rates, without being allowed to benefit from income tax savings associated with University. The application stated that the PSC let Entex "have its cake and eat it too."
On petition for rehearing this Court is asked to reconsider its former opinion regarding its holding on income tax allocation methods.
Upon further study of this record this Court finds the questions to be (1) what is the appropriate method of allocating tax saving deductions realized in a consolidated tax return and (2) does the "stand alone" calculation utilized by Entex and the Public Service Commission satisfy the policy choice of the first issue?
The first issue is resolved by reference to Miss. Code Ann. § 77-3-33 (1972) which in part states:
Such public utility, the rates of which are subject to regulation under the provisions of this article, may demand, collect and receive fair, just and reasonable rates for the services rendered or to be rendered by it to any person. Rates prescribed by the commission shall be such as to yield a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service.
Under the statute utility rates must be just and reasonable. The statutory requirement of just and reasonable rates is satisfied when the rates are cost based. This Court has held:
"That is, the rate should be set so as to allow the Company the opportunity to recover the expense it incurs in providing service and earn, after paying taxes, the allowed rate of return." (Re Columbia Gulf Transmission Co., 54 PUR 4th, at p. 36) (See also Southern Bell Telephone and Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 113 So.2d 622 (1959) and Miss. Power Co. v. Miss. Public Service Commission, 291 So.2d 541 (Miss. 1974).
In this case, the Commission determined that only costs incurred by Entex for its Mississippi rate customers were included. These costs require allocation and various methods were used depending upon the particular item. The record supports the conclusion that only those costs which were incurred in providing utility service in Mississippi were included in Entex's Mississippi revenue requirements. The standard formula used for establishing a utility's revenue requirement is:
REVENUE = OPERATING EXPENSES + RETURN ON RATE BASE + INCOME TAXES
This general theory is expressed by the Federal Energy Regulatory Commission (FERC) in Re Columbia Gulf Transmission Co., 54 PUR 4th 31, at p. 36-37 (1983).
"Despite the profusion of allocation methods we employ, there is a common thread that ties them together. That thread is the concept of cost responsibility or cost incurrence. Each of the methods attempts to allocate costs to the group of ratepayers in question on the basis of a causal link between the service the company provides them and the expenses the company reports. That this is a fair method of allocation is self-evident. And it limits the allowance for expenses to the costs associated with the goods and services provided in the period.
Taxes are no different from other expenses included in the cost of service. So there should be no difference between the principles used to determine the tax allowance and the allowances for other expenses. And we make no distinction. In both cases we limit the allowance charged to ratepayers to an amount equal to the costs the company incurs in serving them. But the application of these principles is a little different in the case of taxes.

*401 The need for a different application of the principles stems from the fact that the income tax is not simply a tax on income. It is a tax on profits, which is gross income less the expenses incurred in producing income. So the tax allowance should be equal to the tax on the profit the ratepayers will contribute to the company. In short, the tax allowance should be equal to the tax on the company's allowed return on equity. This is so because the allowed return on equity is the amount of profit the company should receive for providing service to the ratepayers.
There are, however, vast differences between our assessment of the profit the company is due and the calculation of the amount by which the company is considered to have been enriched by the Internal Revenue Service. Some of these differences stem from the differences in the revenue that is used in calculating the company's profit. The most obvious difference is that we base our determination of the company's profit on projections of revenue. The Internal Revenue Services uses, of course, the revenues the company either actually receives or accrues the right to receive during the tax year. There are even greater differences in the expenses that are recognized.
Because these differences are so vast, the Commission has found that the taxes the company pays to the Internal Revenue Service is not a reliable guide, even as a starting point, for determining a company's tax allowance. Instead, the Commission has always made its own assessment of the tax cost the company incurs in providing service.
We make that independent assessment by considering two elements that go into the calculation of taxes  income and expenses  separately. We start by determining the income we expect the company to receive from the particular service in question. There is usually no problem with this. We then consider the deductions from income. This requires an allocation, for just as the expenses recorded in the company's books may be for services performed for different periods or different classes so also with the deductions reported on the tax return. Here again, we allocate on the basis of the customer's responsibility for the deductions.
Because deductions are given for expenses incurred in producing income, the necessary causal link between ratepayers and the deductions is the expenses the company incurs in providing service. Accordingly, the proper way to allocate deductions is to match the deductions with the expenses included in the cost of service. Thus, when an expense is included in the cost of service, the corresponding tax deduction is also allocated to the ratepayers. In this way any tax reducing benefits, or savings, the company realizes in providing the service are recognized in calculating the tax allowance for the benefit of the ratepayers.
The corollary to this is that when an expense is not included in the cost of service (because the company did not incur that expense in providing service), the deduction created by that expense is not allocated to the ratepayers. To do otherwise would result in the tax savings the company realizes from expenses incurred in providing services to other groups and periods or for its own benefit being used to reduce rates for a particular group of ratepayers. The tax allowance would then be lower or higher than is warranted by the profit each group provides the company. Since the amount of profit to be provided is the measure of the tax cost the company will incur in providing service, none of the rates for the groups would be cost-justified. Subsidization would inevitably result. One group would bear the burden, but another group would gain the benefit. (54 PUR 4th at pp. 36-37).
In the instant case, the Commission used the "stand alone" method of allocating taxes, which method is described in the Columbia, supra, decision as follows:
That the mechanics of calculating a stand-alone tax allowance do not take into account the revenue received and *402 deductions for operating and maintenance expenses is not important. In calculating the tax allowance our policy is that a legitimate expense for cost-of-service purposes is to be considered a legitimate deductible expense in calculating a company's cost of service tax allowance. Accordingly, we can safely ignore the utility's operating and maintenance expenses and the revenues needed to recover those expenses. The only area for concern is the return on rate base.
This may not look like an allocation of the consolidated tax liability. Indeed, it looks like a policy that willfully ignores the consolidated tax liability. At least, this is the way Charlottesville views our stand-alone policy. It says that our stand-alone policy is nothing but a policy that calculates the tax allowance on the false assumption that the pipelines file separate returns and thus ignores the tax savings the group realizes by filing a consolidated return. This is incorrect.
A separate return policy assumes that the tax allowance should be equal to the tax the jurisdictional service would pay if it filed a separate return. Under a separate return policy the tax allowance would equal the tax the jurisdictional service would pay on its projected revenues less the deductions that would be shown on its return. A separate return policy thus ignores the consolidated tax return and reflects in the tax allowance none of the tax reducing benefits the group realizes from filing a consolidated return.
Our stand-alone method is different. It does not ignore the consolidated return or the tax-reducing benefits the group realizes by filing such a return. Unlike a separate return policy, our stand-alone policy in effect looks beneath the single consolidated tax liability and analyzes each of the deductions used to reduce the group's tax liability to determine the deductions for which each service is responsible. It then allocates to the jurisdictional service those deductions which were generated by expenses incurred in providing that service. In making this allocation it is irrelevant on which member's return the deductions would be reported if the group filed separate returns. Instead, the test is whether the expenses that generate the deduction are used to determine the jurisdictional service's rates. Put more simply, the test is whether the expenses are included in the relevant cost of service. If they are, the associated deductions and their tax reducing benefits will be taken into account in calculating the tax allowance for that cost of service. If the expenses are not, the deductions will not be taken into account. In this way the tax allowance will reflect the profit the ratepayers contribute to the group's consolidated taxable income. (54 PUR 4th at pp. 38 and 39).
It is evident in the record that the tax calculation of Entex goes behind the separate return notion. The "stand alone" tax calculation method insures that the tax savings realized from the filing of a consolidated return are shared among the constituent subsidiaries of the group in direct proportion to the allocation of costs or deductions which generate the tax benefit.
The argument presented to this Court by the Attorney General (AG) looks persuasive at first blush. The AG's argument is that Entex should share the tax savings from University's loss and that the tax saving should be passed on to Mississippi ratepayers. This argument, however, overlooks the fact that Mississippi ratepayers are not sharing the University's loss that created the tax savings. The Commission's holding evidenced that it determined that it would be inequitable for the ratepayers to share a "savings" without the allocation of the loss which created the tax savings. The "stand alone" method of tax allocation, as opposed to the "separate return" method, did allocate to the Mississippi ratepayer each and every tax savings attributable to the Mississippi operation.
Additionally, it is suggested to this Court that other consequences may flow from this Court's requiring of a pro rata sharing of income tax "savings" without an allocation of the losses. One such result would be an inconsistency with the previous finding *403 of this opinion that the rates imposed does not burden the taxpayer with any risk associated with University. It is also suggested that requiring an allocation of University's tax "savings" to the Mississippi ratepayers without also allocating the losses which generated those savings would possibly violate the Internal Revenue Service's rules of normalization. The Commission joins Entex in this position and agrees that the "stand alone" tax allocation method employed is proper in this case. The AG relies upon State ex rel. Allain v. Mississippi Public Service Commission, 435 So.2d 608 (Miss. 1983). This case is distinguishable in that the "stand alone" methodology was not utilized.
Therefore, this Court concludes that the tax allocation method chosen by the Commission was in accord with established accounting precedence utilized by regulated companies and with Mississippi statutory and case law. Further, this Court holds that the capital structure utilized does not burden Mississippi ratepayers with any risk of University's operation, and that the allocation of income tax "savings" was considered by the Commission in its opinion.
The Court holds that the Commission's action was not arbitrary, and this Court affirms the action taken in its September 30, 1986 order as a proper exercise of its expertise in determination of the methodology of tax allocation and rate setting authority. The September 30, 1986 Commission order is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON and ANDERSON, JJ., concur.
DAN M. LEE, P.J., and SULLIVAN and ZUCCARO, JJ., dissent.
DAN M. LEE, Presiding Justice, dissenting:
After laborious study of the majority opinion, I find I must dissent. The central issue in this case is not whether to use a utility's actual capital structure to determine jurisdictional revenue requirement for the regulated entity, nor is the issue one of imposing a hypothetical capital structure for such purpose. Rather, the issue is whether the regulated utility company's actual capital structure should be adjusted to remove the effects of risks imposed upon it as the result of its investment in highly risky, non-regulated enterprises.
Numerous state courts and commissions have considered the capital structure issue where the jurisdictional company filing for a rate increase as unregulated non-utility operations included in its capitalization. As the Idaho Commission stated in Re: Intermountain Gas Company, 86 P.U.R.3rd 438 (Id.P.U.C. 1970):
As long as the company engages in non-utility operations such as this, we cannot allow the customers to carry this extra burden in order for the company to maintain its financial integrity.
Id. at 442. The Vermont court in Petition of Green Mountain Power Corp., 131 Vt. 284, 305 A.2d 571 (1973), stated:
From the above cases it can be seen non-utility costs are excluded from the cost of capital in rate proceedings because they are not a regulated activity over which the Board has control. Moreover, it can also be seen that the activities found to be non-utility activities were not activities which the regulated company devoted to a public service.
Id. 305 A.2d at 579. The Court of Appeals in El Paso Natural Gas Co. v. F.P.C., 449 F.2d 1245 (5th Cir.1971), stated the principle that only the capitalization of a regulated company which is devoted to public service should be used in developing its appropriate rate of return:
We say no more than that the intent of the Natural Gas Act is to require that the rate of return developed by the Commission be based only upon the capitalization which a regulated company devotes to public service, where non-public segments of such capital can be distinctly identified and surely isolated.
Id. at 1251. In a more recent case, the Fifth Circuit stated another principle equally applicable, that the rate of return granted a regulated utility should not reflect the *404 higher risk associated with non-regulated activities:
By refusing to give substantial weight to the returns earned by integrated natural gas companies, the Commission was assuring that the risk associated with activities other than transmission and distribution of natural gas would not distort its determination of the proper rate with respect to ARKLA's jurisdictional sales.
Arkansas Louisiana Gas Co. v. FERC, 654 F.2d 435, 438 (5th Cir.1981). Also, in a case from the First Circuit Court of Appeals, that Court upheld FERC in excluding some $6 million from a regulated company's common equity because those funds were not devoted to public use during the test year:
Only if they are related to DOMAC's regulated activities is it fair to count them as a `regulatory' balance sheet asset for purposes of apportioning regulation/related assets among equity, long-term debt, and other liabilities... . DOMAC has not convinced us that the Commission was arbitrary in deciding that these funds were not readily enough available to DOMAC to count as regulated balance sheet capital.
Distrigas of Massachusetts Corp. v. FERC, 737 F.2d 1208, 1218 (1st Cir.1984).
These principles comport with what this Court has stated to be the burden of proof charged to the utility seeking a change in rates, which is that the proposed charges will result not only in a reasonable rate of return for the utility, but also will result in a reasonable rate to the consumer. We stated this principle in State, ex rel. Attorney General v. MPSC, 435 So.2d 608, 615 (Miss. 1983):
However, the utility seeking the change has the burden of proof to establish the need for the increase so that it may obtain a reasonable rate of return upon the value of its assets for the services rendered as well as the burden of substantiating its reasonableness to the consumer.
A fair return to the utility has also been explained in these terms:
A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility ... what the public is entitled to demand is that no more be exacted from the rate payers than the services are reasonably worth.
Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 241, 113 So.2d 622, 656 (1959).
It seems to me, then, that a reasonable rate of return can be determined only upon the basis of capital devoted to public service, and the utility has the burden of proof for establishing that its capital will be devoted to public use if its rate of return is to properly reflect only the risks of its regulated utility operations. Under the majority opinion, the rate payers in the utility company service area will be supporting a rate of return based on Entex's investment in an enterprise which operates in the highly competitive and risky real estate markets in Texas. Such investment is not devoted to public utility use in Texas or in any other state, including Mississippi, and, therefore, will never be of any benefit to the Entex rate payers in this state.
I would reverse and remand the Commission's order, with instructions to the PSC to exclude the effects of Entex's investment in university in establishing the proper capital structure for the company.
SULLIVAN and ZUCCARO, JJ., joined.
NOTES
[1] The difference between the required $2,505,163.00 and the granted $2,450,163.00 is a function of the difference between existing and required rates.

Stipulated Rate Base $20,041,306
Stipulated Rate of Return 12.50%
 ___________
Required Net Operating Income 2,505,163
Stipulated Expenses $73,288,655
 ___________
Total Operating Income Required 75,793,818
Operating Income-Existing Rates 73,343,655
 ___________
Revenue Deficiency $2,450,163